UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

IN RE:                                                          Case No. 10-28935-RBR

GLOBAL ENERGIES, LLC
f/k/a 714 Technologies,  LLC                        Chapter 7 (Involuntary)

Debtor.

_____/

JOSEPH G. WORTLEY,

Plaintiff,

vs.

RICHARD TARRANT, JAMES JURANITCH,          Adv. Pro. No. 15-01447-RBR
CHRISPUS VENTURE CAPITAL, LLC,
CHAD P. PUGATCH, RICE PUGATCH
ROBINSON & SCHILLER, P.A. and
PLASMA POWER, LLC,

Defendants.

_____/

## DEFENDANTS' TRIAL MEMORANDUM

     Defendants, Richard M. Tarrant ("Tarrant"), Chrispus Venture Capital, LLC
("Chrispus"), James Juranitch ("Juranitch"), Chad Pugatch ("Pugatch") and Rice Pugatch,
Robinson and Schiller, P.A. ("RPRS") (collectively, the "Defendants"), hereby submit this Trial
Memorandum for the Court's consideration and state as follows:

## PRELIMINARY STATEMENT

     This trial presents the first opportunity for the Defendants, most of whom were not
parties to the underlying bankruptcy or the appeal, to tell their side of the story.  As the facts

below indicate, this was not a bad faith filing.  More importantly, however, Plaintiff Joseph G. Wortley ("Wortley") has suffered no economic damages and the Defendants have not profited. In the end, this case comes down to the amount of attorney's fees Wortley should be reimbursed, if any, for the alleged withholding of several emails---which was completely inadvertent.  As the discussion below indicates, at best, Wortley is only entitled to be reimbursed those legal fees incurred <u>solely</u> due to the extra legal fees he incurred as a result of Defendants' alleged failure to produce the June 17-19 emails.

## **BACKGROUND**

### A. *Global Energies is formed*

Global Energies, LLC ("Global") was formed in July 2008 to produce and distribute biofuels and carbon dioxide sequestering systems. Wortley and Juranitch were the original members.  Juranitch was an inventor and the company was based around technology created by Juranitch.  Wortley Depo p. 11, lines 5-7.[1]  It is undisputed that Juranitch was integral to Global and it is doubtful it could have survived without him.  Wortley Depo p. 17, lines 11-18.  Wortley provided office space and some start-up capital.  Global did not have any revenue in 2008, 2009 or 2010, and never made a profit.  Wortley Depo p. 12, lines 3-10.  It had negative cash flow at all times.  Wortley Depo p. 25, line 10-12.

In May 2009, Chrispus, primarily owned by Tarrant, also became a member and loaned Global $1 million in a series of $100,000 advances from the summer of 2009 through May, 2010.  Wortley Depo p. 40, lines 1-3.  After Chrispus joined Global, Juranitch owned 63%, Wortley owned 32% and Chrispus owned 5% of Global.  Wortley Depo p. 14, lines 2-15.  At that

---

[1] Wortley Depo refers to the deposition transcript of Joseph Wortley's deposition taken in this adversary proceeding on June 12, 2017, June 13, 2017 and June 21, 2017 contained in Chrispus and Tarrant's Exhibit Register as D1-R8, D1-S8 and D1-T8, respectively.

time, the members entered into an Amended and Restated Operating Agreement governing their respective rights as members of Global.  See (Ex. D1-D).[2]  The Amended and Restated Operating Agreement limited Global's business as one related to Juranitch's development of technology related to biofuels and carbon dioxide recovery and sequestering systems.  *Id*. at §2.2 and Exhibits "B" and "C".  The Amended and Restated Operating Agreement also designated Juranitch and Wortley as managing members.  *Id.* at §5.2.  Neither Chrispus nor Tarrant ever became a manager of Global.  Wortley Depo p. 39, lines 17-19.

Pursuant to the Amended and Restated Operating Agreement, a "majority vote" was required to take any corporate action, including but not limited to approving a merger, sale or other disposition of Global's assets or the dissolution or winding up of Global's affairs.  See Amended and Restated Operating Agreement (Ex. D1-D) at §5.2.  Importantly, a "majority vote" was defined to require the consent of at least 75% of the voting shares of Global.  *Id*. at §1.3.  As such, the only way a "majority vote" could ever be achieved would be if Juranitch and Wortley agreed on a particular issue.  Wortley Depo p. 36, lines 19-24.

**B.  Global Energies never generates any revenue, is unable to pay its debts, and ultimately "explodes" due to a lack of funds and a deadlock between Wortley and Juranitch**

From May 2009 through May 2010, the company attempted to market Juranitch's inventions.  However, these marketing efforts proved futile and Global failed to generate any revenue and survived solely on the proceeds of Chrispus' loan.  See Wortley Depo at p. 40, lines 9-12.  By the end of April 2010, Global had burned through the Chrispus loan proceeds and did not have enough money to pay its bills.  Wortley Depo p. 76, lines 6-25; p. 77, lines 1-7; p. 78,

---

[2]  References to exhibits shall be referred to as Ex. and shall indicate the exhibit number as set forth in Chrispus and Tarrant's Exhibit Register.  Chrispus and Tarrant are collectively "D1".

lines 1-13.  By May 2010, Global was completely out of funds and could only survive with an influx of new capital or by borrowing additional funds.  Wortley Depo p. 41, lines 12-15.

In early 2010, Wortley did not have much contact with Juranitch, and Wortley believed that Juranitch had lost focus on Global and was "veering off track."  Wortley Depo p. 43, lines 8-11.  To make matters worse, in early April, 2010, Juranitch and Wortley had a serious argument, were not getting along and were barely speaking.  Wortley Depo p. 60, lines 18-22, p. 61, lines 1-2.  On May 12, 2010, the building animosity between Juranitch and Wortley came to a head at a meeting in which Wortley demanded that Juranitch turn over some of his equity in Global to him.  Wortley Depo p. 52, lines 24-25, p. 53, line 1.  In response, Juranitch stormed out of the meeting.  Wortley Depo p. 52, lines 16-17.  Although there is a dispute as to what happened first, Wortley canceled Global's credit cards, Juranitch removed various assets from Global's premises, and Wortley changed the locks on Global's premises thereby locking Juranitch and Global's employees out of Global.  Wortley Depo p. 55, lines 14-25, p. 56, lines 1-3.  Moreover, all of Global's employees walked out that day.  Wortley Depo p. 78, lines 15-25.  During this time, Tarrant was on vacation in France and was unaware of what was happening at Global.  Wortley Depo p. 56, lines 10-25.  Wortley contacted Tarrant by email to inform him that Juranitch "absconded with Global's assets to parts unknown" and that all of Global's employees had left with Juranitch.  See (Ex. D1-E); Wortley Depo p. 57, lines 7-22.

As of this point, all communication broke down between Wortley and Juranitch.  Wortley Depo p. 59, lines 2-5, 8-12.  In a May 17, 2010 email, Wortley described Juranitch as being "so far off the reservation."  See (Ex. D1-G); Wortley Depo. p. 62, lines 9-21.  In fact, Wortley learned that Juranitch refused to work with him any longer, and he acknowledges that Global had significant problems and issues.  Wortley Depo p. 62, lines 22-25, p. 63, lines 1-2.  This

4

complete breakdown in communication between Juranitch and Wortley made it impossible to achieve a "majority vote" and completely deadlocked Global. Wortley Depo p. 36, lines 19-24.

As of May 2010, Global's finances were in even worse shape than its dysfunctional management. Global was out of money and needed additional funds in order to survive. Wortley Depo p 66, lines 20-25. Global could not pay and failed to pay the payroll due its employees on May 21, 2010. Wortley Depo p. 67, lines 3-5. Global even failed to pay sums owed to its Chief Engineer, Alan Reynolds, who sent the company a letter stating that he needed to know if he would get paid the salary and benefits he was owed, otherwise he would be forced to take action. See (Ex. D1-H); Wortley Depo p. 69, lines 10-16. Third parties who had lent Global equipment necessary for it to operate sought to repossess their equipment. See (Ex. D1-K); Wortley Depo p. 80, lines 7-20. Wortley himself had a $100,000 promissory note that was in default, and he instructed his lawyer to file a UCC-1 in an attempt to secure his note. Wortley Depo p. 65, lines 16-18, p. 66, lines 6-9. In fact, Wortley even admits that Global was "exploded" and "trashed" as of May 13, 2010 and described Global as a "mess." Wortley Depo p. 70, lines 20-25, p. 71, lines 8-10; p. 81, lines 17-20. Wortley himself acknowledged that Global should no longer continue to operate because it could not pay its employees or its vendors. See (Ex. D1-L); Wortley Depo p. 84, lines 15-18.

### C. Wortley embezzles funds from Global

Shortly thereafter, Tarrant arrived back from Europe and Wortley met him at the airport to discuss Global's situation. Wortley Depo p. 84, lines 20-22. After meeting with Wortley, Tarrant, who was now understandably nervous about the likelihood of Chrispus' million dollar loan ever being repaid, requested that his financial advisor, Ron Roberts ("Roberts"), and a forensic accountant, Dan Wyand, travel to Florida to review Global's financial records. Wortley

42211712;3

Depo p. 85, lines 6-22.  Thereafter, Tarrant informed Wortley that Chrispus' forensic accountant had discovered numerous questionable financial transactions between Wortley and Global. Wortley Depo p. 85, lines 23-25; p. 86, lines 1-8.  Specifically, Tarrant informed Wortley that Chrispus' forensic accountant had determined that Wortley "embezzled" $48,000 from Global. See (Ex. D1-M); Wortley Depo p. 86, lines 9-13.

As of late May 2010, just one year after Chrispus invested over $1 million into Global, the company was broke and could not pay its employees or vendors.  See (Ex. D1-J); Wortley Depo. p. 78, lines 3-14.  Juranitch, the person most vital to Global, had left the company along with all the employees.  Wortley Depo. p. 78, lines 21-25.  Its two managers, Wortley and Juranitch, were not even speaking and Juranitch made it clear that he would no longer work with Wortley.  Global was deadlocked-- essentially "exploded" and "trashed."  Moreover, Chrispus' forensic accountant determined that Wortley had embezzled $48,000.  Understandably, Tarrant, through Chrispus, refused to invest any more money in Global in its current condition.  Even Wortley admits that it made no sense for Tarrant to invest more money in Global at this time. Wortley Depo p. 91, lines 15-25.

### D.  Chrispus attempts multiple times to restructure Global by breaking the deadlock between Juranitch and Wortley

Notwithstanding the fact that Global was broke, over the next month Chrispus attempted numerous times to break the deadlock between Wortley and Juranitch, recognizing that such was necessary in order to have any chance of ever being repaid its loan.  First, Tarrant offered to buy Wortley out.  See (Ex. D1-N); Wortley Depo p. 97, lines 22-24.  However, Wortley refused the offer.  Wortley Depo p. 97, line 25; p. 98, line 1.  After Wortley rejected this offer, Tarrant asked

Wortley to buy him out by returning his $1 million.  Wortley rejected this proposal as well.  See (Ex. D1-N); Wortley Depo p. 98, lines 2-6, lines 22-24.

Having failed in his previous offer to buy Wortley out or to have Wortley buy him out, Tarrant made another offer to Wortley in an attempt to break the deadlock.  On June 13, 2010, Tarrant emailed Wortley a new settlement offer whereby he proposed to split Global up into two companies, giving Wortley full control over some of Global's technology.  See (Ex. D1-O); Wortley Depo p. 103, lines 11-24.  Again, Wortley rejected this offer.  Wortley Depo p. 104, lines 14-15.

On June 28, 2010, Chrispus, through Roberts, made Wortley yet another proposal in an attempt to circumvent the deadlock between Juranitch and Wortley in order to "bring Global back to life."  See Ex. D1-P; Wortley Depo p. 107, lines 3-8; Wortley Depo p. 111, lines 12-15.  In this proposal, Chrispus now offered Wortley the opportunity to place his long-time business associate and trusted advisor, Bill Gates ("Gates"), or another designee, on Global's management team in Wortley's place.  This would have resolved the deadlock between Juranitch and Wortley, leading to Juranitch's return while at the same time allowing Wortley to maintain his ownership of Global.  See (Ex. D1-P); Wortley Depo p. 107, lines 16-25; p. 108, lines 3-7.  Once again, Wortley refused to discuss the offer.  Wortley Depo p. 109, lines 2-12.

On June 30, 2010, Roberts sent Wortley another email attempting to get Wortley to discuss restructuring Global.  See (Ex. D1-Q); Wortley Depo p. 119, lines 9-15.  Once again Wortley failed to respond.  Wortley Depo p. 120, lines 4-6.  Thereafter, on July 1, 2010, after not receiving a response to its numerous attempts to restructure Global and "bring it back to life," Chrispus, left with no other choice, was forced to file an involuntary bankruptcy petition under

Chapter 11 in an attempt to reorganize Global.[3]  That day, Roberts sent Wortley and Juranitch an email explaining "[d]ue to a significant impasse created by the existing operating agreement, the close down of all operations of Global Energies and the apparent lack of willingness to restructure the existing operating agreement, you have left Chrispus Venture Capital no other choice than to place Global Energies, LLC into an involuntary bankruptcy."  See (Ex. D1-R).

### E.  Even after the bankruptcy petition was filed, Chrispus still attempted to restructure Global and bring Wortley and Juranitch back together.

Even after the bankruptcy was filed, Chrispus still attempted to bring Juranitch and Wortley back together in an attempt to resurrect Global.  On July 14, 2010, Roberts sent an email to Gates stating, in relevant part, "[i]n an effort to facilitate a discuss [sic] and attempt to come to a quick resolution, hopefully one in which Global Energies continues on as a viable entity, I am attaching the proposals that was [sic] given to Joe."  See (Ex. D1-T).  Wortley once again ignored this proposal.  Wortley Depo p. 130, lines 18-20.  In addition to emailing Gates, Roberts left Gates a voicemail on July 16, 2010 wherein he alerted Gates that Tarrant was committed to funding Global's restructuring on a month-to-month basis and even paying Wortley rent for the use of his premises.  See (Ex. D1-U).  Once again, Wortley failed to respond to this proposal. Wortley Depo p. 135, lines 13-20.

On July 21, 2010, Roberts sent Wortley and Gates another email, copied to Juranitch, stating in relevant part "[a]ttached is the proposal that was sent to Joe on 6/28/2010 and to you Friday 7/14/2010.  I believe we have made a serious good faith effort to resolve the Global Energies issues.  As Joe's "go to guy" I would have hoped to at least received the curtsey [sic] of a return call.  If Joe or you wish to continue to ignore Chrispus' attempts to resolve the issues in a forum other than the Federal Court then so be it.  I await your response."  See (Ex. D1-V).

---

[3]  The fact that the involuntary was filed under Chapter 11 indicates an intent to restructure Global.

Thereafter, at 4:55 pm, Juranitch responded to Robert's email stating "Gentlemen, It seems dumb to shoot the flock of golden geese known as Global Energies. . . . Is it really worth the conflict? Bill, I hoped you would engage in some sort of negotiations.  Joe and Bill, I hate to see the two of you destroy any chance of this company becoming a success.  It doesn't seem rational."  See (Ex. D1-V).  In response, Roberts sent one last email to Juranitch, Gates and Wortley attempting to bring the parties together stating, "can I suggest a meeting with all hands in an attempt to resolve this once and for all.  It means that everyone needs to come into the meeting leaving their baggage outside."  See (Ex. D1-V).  Once again, Wortley did not respond, instead deciding to let the situation "stew."  Wortley Depo p. 141, lines 3-5.  <u>This evidence, which the Defendants have never had an opportunity to put in the record, is the best evidence that the bankruptcy was not filed for an improper purpose.  After all, if the Defendants filed the bankruptcy with the intent and for the purpose of stealing the company from Wortley, why would they be attempting on multiple occasions to bring him back into the company after the bankruptcy was filed?</u>

   *F.  After unsuccessful attempts to bring the parties together, the bankruptcy moves forward.*

After Wortley continually rebuffed Chrispus' efforts to bring the parties together, the bankruptcy progressed.  In an attempt to break the deadlock that had crippled Global for months, Chrispus filed a motion to appoint a Chapter 11 trustee.  See (D.E. 4); (Ex. D1-K9).[4]  In response, Wortley filed Joseph G. Wortley's Response to Motion for Appointment of Chapter 11 Interim Trustee ("Response to Motion for Trustee") wherein he "welcomed the appointment of a permanent trustee" because there was a "deadlock" between Global's two managing members.  See (D.E. 12); (Ex. D1-L9) at ¶2.  Importantly, in his Response to Motion for Trustee, Wortley

---

[4] Cites to documents in the main case will be labeled by "D.E.".  Cites to documents in the adversary case will be "Adv. D.E.".

claimed to have "evidence which supports a conspiracy by Juranitch and perhaps Chrispus and its principal Richard Tarrant to remove corporate assets and opportunities, to squeeze Wortley out of Global and to start a new company which operations are identical to that of Global."  See (D.E. 12); (Ex. D1-L9) at ¶4.  Additionally, in his Response to Motion for Trustee, Wortley claimed that Global's debts were "manipulated" to create defaults in order to file the involuntary petition.  See (D.E. 12); (Ex. D1-L9) at ¶20.  Despite claiming to have evidence of a "conspiracy," Wortley did not oppose the involuntary petition, but actually embraced it by supporting the appointment of a trustee to break the deadlock.[5]  On August 4, 2010, this Court entered an order for relief.  (D.E. 15).[6]

Barry Mukamal ("Mukamal" or "Trustee") was appointed trustee and immediately took control of Global and its assets.   (D.E. 18).   Over the next couple of months, Mukamal investigated Global's business records and affairs and acknowledged the stalemate and disagreements between Wortley and Juranitch threatened Global's viability.  See (D.E. 51); (Ex. D1-H9) at ¶8.  In September 2010, Mukamal organized a meeting for the purpose of discussing Global's future direction, including determining what was needed to maintain Global as a going concern and to discuss the possibility of debtor in possession financing.  Wortley Depo p. 234, lines 14-24; p. 239, lines 8-21.  Wortley, Roberts (on behalf of Chrispus), Mukamal and their respective attorneys all attended the meeting in person.   Juranitch attended by telephone. Wortley Depo pp. 238, lines 9-25.

At the meeting, Mukamal explained that Global was out of money and would not be able to be restructured without finding new money.  Wortley Depo p. 239, lines 22-25, p. 240, lines 1-

---

[5] This clearly constitutes a waiver of any claims under 11 U.S.C. §303(i) which the Court already found in connection with its order dismissing Wortley's §303(i) claim.
[6] As required under §303(h).

6.  Wortley expressed a desire for the Trustee to market Global and stated that he had lined up marketing companies and investment bankers to assist the Trustee.  Wortley Depo p. 240, lines 7-13.  Wortley also indicated that he had potential sources to fund Global's operations.  Wortley Depo p. 242, lines 7-11.  However, Wortley never followed through with providing the Trustee any marketing companies, investment bankers or sources of financing.  Wortley Depo p. 242, lines 12-19.  Thereafter, the Trustee determined that a sale of Global's assets was in the best interest of its creditors.  Wortley Depo p. 242, lines 24-25, p. 243, lines 1-18; and Transcript of Hearing of October 19, 2010 (Ex. D1-N), p. 13, lines 1-3.  Based on that, on October 6, 2010, the Trustee filed a motion to sell Global's assets to Chrispus.  See Trustee's Expedited Motion to Approve Bidding Procedures ("Sale Motion") (D.E. 51); (Ex. D1-H9) at ¶9.  Importantly, Wortley and others were afforded the opportunity to bid on Global's assets.  See Transcript of October 19, 2010 Hearing (Ex. D1-N9), pp. 4-5.

On October 7, 2010, Wortley filed his Expedited Motion to Dismiss Case as Having Been Filed in Bad Faith (the "First Motion to Dismiss") (D.E. 54).  A hearing on the Sale Motion and a preliminary hearing on Wortley's First Motion to Dismiss were scheduled for October 12, 2010.  (D.E. 52 and 55).  At the hearing, the Court treated Wortley's First Motion to Dismiss as an objection to the Sale Motion, granted the Sale Motion on a modified basis, and scheduled a hearing on approval of the sale for November 15, 2010.  See of Transcript of October 12, 2010 Hearing (D.E. 68) and Order (A) Approving Bidding Procedures for the Sale of all of the Debtor's Assets and Breakup Fee Pursuant to the Asset Purchase Agreement; (B) Scheduling Hearing to Approve the Selection of the Highest and Best Offer For Sale of All of the Debtor's Assets; and (C) Approving Form and Manner of Notice of Sale and (D) Granting Certain Related Relief (D.E. 70).

The evidentiary hearing on Wortley's First Motion to Dismiss was scheduled for November 10, 2010.  See Order Continuing Hearing (D.E. 77).  The only discovery initially issued in conjunction with the pending evidentiary hearing were three depositions noticed by Wortley (D.E. 58-67 and 69) and Chrispus' notice of Wortley's deposition. Subsequent to the depositions – and at the suggestion of Chrispus' counsel – the parties exchanged last minute document requests including a request from Chrispus directed to Wortley and Wortley's First Request for Production of Documents to Chrispus Venture Capital, LLC (the "First Request for Production").   (D.E. 80). The First Request for Production was the subject of Wortley's Amended Emergency Motions: To Continue Hearing on Motion to Dismiss; To Compel Production of Documents; and for Sanctions (the "Motion to Compel") (D.E. 80).    An evidentiary hearing on the First Motion to Dismiss and the corresponding Motion to Compel was held on November 10, 2010.   Wortley's counsel withdrew the Motion to Compel at the November 10, 2010 evidentiary hearing, proffering that Chrispus had produced responsive documents, thus making the pending motion moot. See Transcript of November 10, 2010 Hearing, pp. 3-4 (D.E. 88).  It should be noted that Chrispus' response was not due until after Wortley's had been produced and was timely produced a day after Wortley responded.   The Court proceeded to conduct an evidentiary hearing on the merits of the First Motion to Dismiss. (D.E. 88).

On November 12, 2010, Wortley filed an objection to the Sale Motion (the "Sale Objection") (D.E. 85).  In his Sale Objection, Wortley incorporated by reference the grounds set forth in his First Motion to Dismiss.  (D.E. 85).  One week later, on November 18, 2010, after the Court's November 10, 2010 evidentiary hearing, while the Court's ruling was still pending, Wortley withdrew his First Motion to Dismiss.  (D.E. 90). Wortley did not, however, withdraw

the Sale Objection.  On November 30, 2010, the Court entered an order denying Wortley's First Motion to Dismiss (D.E. 97) and also entered an Order approving the Trustee's sale of the Debtors' assets to Chrispus (the "Sale Order") (D.E. 98).  In the Sale Order, the Court found no evidence in support of Wortley's First Motion to Dismiss sufficient to sustain Wortley's burden of proof on the Sale Objection.  (D.E. 98).

Several months later, on March 21, 2011, Wortley filed another motion to dismiss the Chapter 11 case under 11 U.S.C. §1112 (the "Second Motion to Dismiss") (D.E. 128).   In response, Chrispus filed a Motion for Summary Judgment and/or to Quash Joseph G. Wortley's Motion to Dismiss Chapter 11 Case for Bad Faith Based on New and Additional Evidence of Conspiracy and Misrepresentations and Motion to Deem May 4, 2011 Evidentiary Hearings as Pretrial and/or Status Conferences (the "Motion for Summary Judgment") (D.E. 147).

The Second Motion to Dismiss was heard at an evidentiary hearing on September 20, 2011.  See Transcript of September 20, 2011 hearing (D.E. 440).  At the day-long hearing, Wortley's counsel argued that the Second Motion to Dismiss should be granted based on "new evidence" comprised of "smoking gun" emails already in his possession.  *Id.* at p. 15, lines 5-10; p. 17, lines 18-24.    During the presentation of Wortley's case in chief, the Court correctly pointed out "but this [alleged new evidence] was known".  *Id.* at p. 180, line 25.  At the conclusion of Wortley's case in chief, Chrispus moved for judgment on partial findings based on Wortley's failure to present "new" evidence or proof of bad faith. *Id.*  On September 27, 2011, this Court entered its Order (1) Granting Petitioning Creditor Chrispus Venture Capital, LLC's Ore Tenus Motion for Judgment on Partial Findings and (2) Denying Interested Party Joseph G. Wortley's Motion to Dismiss Chapter 11 Case for Bad Faith Based on New and Additional Evidence of Conspiracy and Misrepresentations (the "Order Granting Motion for Judgment on

Partial Findings and Denying Second Motion to Dismiss") (D.E. 399)("Partial Findings"), wherein the Court found, *inter alia*, that Wortley failed to meet his burden of proof in support of the Second Motion to Dismiss.  <u>Importantly, this meant that Chrispus never had an opportunity to present its evidence to the Court because the granting of the Partial Findings eliminated the procedural basis to introduce the evidence.</u>

On October 4, 2011, Wortley appealed the Order Granting Motion for Judgment on Partial Findings and Denying Motion to Dismiss (the "First Appeal") (D.E. 404) to the United States District Court for the Southern District of Florida (the "District Court").  On January 26, 2012, the District Court dismissed the First Appeal based on Wortley's failure to file an initial brief (the "Order Dismissing First Appeal") (D.E. 455).  On February 24, 2012, Wortley appealed the Order Dismissing First Appeal to the Eleventh Circuit Court of Appeals ("Eleventh Circuit") (D.E. 14 in District Court Case No. 11-62747-KMM).  On April 17, 2012, the Eleventh Circuit dismissed the appeal based on Wortley's failure to file an initial brief (D.E. 19 in District Court Case No. 11-62747-KMM).

On April 23, 2012, Wortley filed his Motion for Rehearing under Federal Rule of Civil Procedure 60(b)(2) and (b)(3) based on alleged "newly-discovered evidence" and evidence of bad faith (the "Motion for Rehearing") (D.E. 465).  After a hearing on the Motion for Rehearing and Chrispus' response to same (D.E. 477), the court entered an order denying the Motion for Rehearing on May 29, 2012 (D.E. 482) concluding that the alleged newly discovered evidence was cumulative and stating that "it doesn't change anything." See Transcript of May 24, 2012 Hearing (D.E. 485); (Ex. D1-X9), p. 22, line 5.[7]

---

[7]    More specifically, the Court stated the following during its exchange with Wortley's counsel, Steven S. Newburgh:

On June 8, 2012, Wortley filed a Notice of Appeal of the Order denying his Motion for

Rehearing (D.E. 486).  The District Court held a hearing on March 13, 2013, and on March 15,

2013, entered an order affirming the bankruptcy court's denial of his Motion for Rehearing.

(D.E. 30 in District Court Case No. 12-61483-KMW).

---

THE COURT:  How would that [alleged withholding of critical evidence]
change anything?
MR. NEWBURGH:  It would certainly change everything.
THE COURT:  How would it change anything?  Mr. Mukamal would have
gotten appointed as Trustee.  Mr. Mukamal marketed the property on the open
market.  The property was sold.  Those are all final orders.

(D.E. 485, Transcript of May 24, 2012 Hearing, p. 7:21-25).

MR. NEWBURGH:  So under 60(b)(2) and (b)(3), because we think there's
been a fraud on the Court here, as well, we at least seek the opportunity to bring
this evidence before the Court and get these witnesses in here.
THE COURT:  For what purpose?
MR. NEWBURGH:  Because we have a right –
THE COURT:  You've got your lawsuit going in state court.
MR. NEWBURGH:  It has nothing to do with this bankruptcy, though, Judge, in
terms of the bankruptcy itself.
THE COURT:  Isn't the bankruptcy, and the participation thereof, part of your
state court litigation, in that the interaction of the former partners in the
involuntary petition is one of the causes of action that you're claiming damages
for?
…
THE COURT:  Wortley approved of the appointment of a Trustee.

(D.E. 485, Transcript of May 24, 2012 Hearing, pp. 8:20-25, 9:1-11, 20-21).

MR. NEWBURGH:  There is just no explanation for the withholding of the
evidence at the time it was supposed to be produced.  I have with me every piece
of paper that was produced by Mr. Pugatch's firm on November 9, 2010.
THE COURT:  It doesn't change anything.
…
THE COURT:  Wortley had his day in Court.
MR. NEWBURGH:  He didn't have a day in court, because he didn't have all
the evidence.
THE COURT:  He had several days in court, including appeals.
MR. NEWBURGH:  He did not have his day in court, because he did not have
the evidence that was withheld from him in this case.
THE COURT:  But he knew that they were all talking.  He knew the purpose of
the Chapter 11.  He consented to the Chapter 11 Trustee.  The Chapter 11
Trustee did his job.  He sold the business.  That's why he's the Trustee.

(D.E. 485, Transcript of May 24, 2012 Hearing, pp. 21:25, 22:1-5, 12-24).

### G.  *Wortley misrepresents numerous facts to the Eleventh Circuit*

Wortley appealed the District Court's order to the Eleventh Circuit Court of Appeals on April 9, 2013.  (D.E. 31 in District Court Case No. 12-61483-KMW).  In his briefs, Wortley mischaracterized what actually occurred.  First, he selectively quoted from the "newly discovered" emails—deleting sentences that illustrated Chrispus' primary objective was to "resurrect Global" and make it "profitable and get its primary debt repaid."  Wortley's initial brief quotes the June 17, 2010 email as follows:

*Hello Rich:*

*The following is my humble attempt at presenting a strategy for Global Energies / Plasma Power starting next week. If you and Ron [Roberts] agree with the memo, I recommend we have [petitioning creditor Chrispus' bankruptcy counsel] Chad Pugatch review it, and add his insight. The plan is:*

*1.      Rich [Tarrant] communicates with Joe [Wortley] on Tuesday when he is back, and requests a response on the offer that [Tarrant] extended Sunday night, which expired last Tuesday. [Tarrant] gives [Wortley] until the end of the business day.*

*2.      If a meaningful response is received Rich [Tarrant] and Jim [Juranitch] start negotiating . . . A two day window is given to Joe [Wortley] for a completed agreement.*

*3.      If no meaningful response is received from Joe [Wortley], Chrispus Ventures files for "Debtor in Possession" rights under Chapter 11 law on Wednesday.*
[Ini. Br. 10.]

But the full version of the June 17, 2010 email tells a different story.  Paragraph "2." in full provides:

*2.      If a meaningful response is received Rich and Jim start negotiating __in earnest to resurrect Global and move back into Deerfield under the new plan.__ A two day window is given to Joe for a completed agreement.*

And omitted paragraph "4." says:

*4.      As soon as a judge grants Chrispus the trustee position (hopefully in a week) Plasma Power LLC grants Global Energies (for additional debt to be used in later negotiations) a limited license to use its patent pending Feedwater technology to pursue the Iowa job and*

*other potential jobs specifically called out such as WE energies.* ***This would be in keeping with Chrispus's desire to make Global Energies profitable and get its primary debt repaid.*** *It also allows us to continue the sales effort with no drop in continuity. . . .*

(D.E. 465-7 at 5) (emphasis added).

Second, Wortley wrongly told the Eleventh Circuit that he did not discover the alleged "conspiracy" until after the sale—when in fact he alleged to have evidence of the conspiracy in his Response to the Motion to Appoint a Trustee, which was filed prior to the entry of the order for relief.  Moreover, he did not inform the Eleventh Circuit that he actually supported the bankruptcy as he believed that a trustee was necessary to break the deadlock between him and Juranitch.  See Wortley Init. Br. (Ex. D1-X); Wortley Response to Trustee Motion (D.E. 12) and (Ex. D1-L9) at ¶4.

Third, Wortley said the subject emails had been hidden without revealing that the reason his counsel never saw the emails was because his counsel never picked up the discovery materials until late March of 2012—despite being notified numerous times, as early as June 2011[8] that bankers' boxes of documents were available for their review.  When Wortley obtained new counsel in the state court case, his new attorneys were advised in September 2011 and again in March 2012 that the documents were available.   See (Exs. D2-N4 and D2-B5).  Wortley's attorneys finally retrieved the documents on March 29, 2012, and were able to locate the June 17-19 Emails within 48 hours of receipt of the documents.  Wortley depo. p. 325, lines 19-25; p. 326, lines 1-4; (D.E. 465-1)

Of course, Wortley's misleading assertions concerned the Eleventh Circuit.  The decision concludes Wortley facially stated a basis for relief in his Rule 60(b)(2) motion. *In Re Global Energies, LLC,* 763 F.3d 1341, 1349-50 (11th Cir. 2014) (Ex. D1-Y).  But it then appears to

---

[8] At trial, testimony will be offered to show that the documents were made available to Wortley as of June 2011.

"grant" the Rule 60(b)(2) motion without an evidentiary hearing—even though remand for an evidentiary hearing was the only relief Wortley sought. *Id.* Because there had never been an evidentiary hearing and fact-finding by the lower court, the Eleventh Circuit was unaware of what had actually occurred. In addition, without an evidentiary hearing or opportunity to be heard, the decision discusses relief to be granted against both parties and non-parties. However, the decision recognizes that an opportunity to be heard was required before such relief can be granted:

> *On remand, the bankruptcy court shall grant Wortley's Rule 60(b)(2) motion and vacate its order approving the sale of Global's assets to Chrispus. . . . The bankruptcy court then shall conduct any hearings necessary in the exercise of all its powers at law or in equity and issue appropriate orders or writs, including without limitation orders requiring an accounting and disgorgement, orders imposing sanctions, writs of garnishment and attachment, and the entry of judgments to ensure that Chrispus, Juranitch, Tarrant, and Pugatch do not profit from their misconduct and abuse of the bankruptcy process. The bankruptcy court shall vacate the sanctions imposed upon Wortley and ensure that he is fully compensated for any and all damages, including Wortley's attorneys' fees and costs. <u>The only reason that this court does not impose any of these remedies is that Chrispus, Juranitch, Tarrant, and Pugatch have not had an appropriate hearing, which will be conducted before the bankruptcy court.</u>*

*In re Global*, 763 F.3d at 1350 (emphasis added).

After the Eleventh Circuit issued its opinion, Wortley filed a motion to be awarded his appellate attorney's fees. In further recognition of the Defendants' entitlement to due process before imposing the remedies discussed in its opinion, the Eleventh Circuit denied Wortley's motion for appellate attorneys' fees. *In Re Global*, Order on Appellant's Motion for Award of

18

Appellate Attorneys' Fees and Remand for Determination of Amount (11th Cir. Jan. 12, 2015) (Ex. D1-C3). The denial order states: "[T]his Court hereby transfers the issues of Appellant's statutory entitlement to appellate attorney's fees incurred in this Court and the reasonable amount, if any, to be awarded." *Id.* (emphasis added). Recently, believing that the bankruptcy court was failing to follow the Eleventh Circuit's mandate because it was affording the Defendants' due process, Wortley filed a petition for writ of mandamus with the Eleventh Circuit seeking to prohibit the bankruptcy court from considering the Defendants' affirmative defenses. (D.E. 1 filed March 31, 2017 in Eleventh Circuit Case No. 17-11429). Apparently agreeing with the bankruptcy court that the Defendants were entitled to their day in court, the Eleventh Circuit denied Wortley's petition for writ of mandamus.[9] (D.E. 16 entered June 6, 2017 in Eleventh Circuit Case No. 17-11429).

## ARGUMENT

**A.** ***Wortley misinterprets the Eleventh Circuit Opinion by concluding that it ordered dismissal for a bad faith filing when in fact the Eleventh Circuit only addressed alleged discovery misconduct in the context of a Rule 60(b)(2) analysis***

It is extremely important to understand that the Eleventh Circuit was not in any way dealing with the appeal of a motion to dismiss for bad faith filing and never ordered the Court to dismiss the bankruptcy. Wortley's appeal to the Eleventh Circuit <u>exclusively</u> involved the appeal of an order denying his Rule 60(b) motion, which only sought to have the bankruptcy court grant a motion for rehearing to consider alleged newly discovered emails in connection with his previous motion to dismiss the bankruptcy proceeding. Wortley fundamentally misunderstands this important distinction and claims that the Eleventh Circuit resolved all aspects of the underlying relief sought in his Rule 60(b) motion even though a full evidentiary

---

[9] Importantly, the panel that denied Wortley's petition for writ of mandamus consisted of two of the three original judges that issued the original opinion.

hearing on the motion to dismiss never occurred.[10]  Wortley is incorrect and a close look at the Eleventh Circuit's opinion indicates that it was only dealing with a 60(b) discovery issue.  <u>This fact is extremely important because once it is understood, the scope of attorney's fees that can be awarded is clearly defined by recent Supreme Court precedent.</u>

More specifically, the Eleventh Circuit opinion starts out by setting forth Wortley's version of the facts.  See Eleventh Circuit Opinion (Ex. D1-Y).  Then, on page 8 of the opinion, it begins its legal analysis by setting forth the Eleventh Circuit test that must be satisfied in order for a trial court to grant relief from judgment (the order denying Wortley's 60(b)(2) motion) based on newly discovered evidence.  As set forth by the Eleventh Circuit in the opinion, in order to have his alleged newly discovered evidence considered by the bankruptcy court, Wortley had to demonstrate five things: (i) the new evidence was discovered after the judgment was entered; (ii) he had exercised due diligence in discovering the evidence; (iii) the evidence was not merely cumulative or impeaching; (iv) the evidence was material; and (v) the evidence was likely to produce a different result.  *Id*. at pp. 8-9.

Thereafter, the Eleventh Circuit went on to apply the 60(b)(2) test to Wortley's version of the facts.  On page 11, the court concluded that the first factor was met because it believed Wortley discovered the June 17-19 emails in March, 2012 – well after the bankruptcy court denied his motion to dismiss.  *Id*. at p. 11.  The court then applied the second factor and concluded Wortley was diligent.  On page 13 of its opinion, it considered the third factor and determined that the subject emails were "evidence of" a bad faith filing.  On page 14, it considered the fourth factor and deemed the emails were material.  Finally, on page 14, it

---

[10]  Due to the fact that the court granted Chrispus' Motion for Judgment on Partial Findings, Chrispus never had the opportunity to present evidence to the court.

considered the fifth factor concluding that the June 17-19 emails "were **likely to produce** a different result on Wortley's motion to dismiss." *Id.* at p. 14 (emphasis added).

Importantly, the Eleventh Circuit's analysis was solely in the context of applying the 60(b)(2) test and the Eleventh Circuit only determined that the emails were "likely to produce" a different result in applying the fifth element of that test. Although the Defendants' counsel have not uncovered any cases explaining the "likely" standard in the context of a 60(b)(2) motion, the Supreme Court has explained the "likely" standard in the analogous context of preliminary injunctions.

In the case of *University of Texas v. Camenisch*, 451 U.S. 390 (1981), the respondent asserted that he was entitled to a permanent injunction because he proved likelihood of success on the merits at the preliminary injunction stage. In undertaking its analysis, the Supreme Court compared the burden of proof at the preliminary injunction stage that required the movant to prove "likelihood of success" with the movant's ultimate burden of proof in the context of a permanent injunction. In determining that "likelihood of success" required a much lower burden of proof than required to prove the ultimate merits, the Supreme Court stated:

> This reasoning fails, however, because it improperly equates "likelihood of success" with "success," and, what is more important, because it ignores the significant procedural differences between preliminary and permanent injunctions. The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing, *Progress Development Corp. v. Mitchell*, 286 F.2d 222 (CA7 1961), and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits, *Industrial Bank of Washington v. Tobriner*, 132 U.S.App.D.C. 51, 54, 405 F.2d 1321, 1324 (1968); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (CA2 1953). In light of these considerations, it is generally inappropriate for a federal court at the

preliminary injunction stage to give a final judgment on the merits. E.g., *Brown v. Chote*, *supra*; *Gellman v. Maryland*, 538 F.2d 603 (CA4 1976); *Santiago v. Corporacion de Renovacion Urbana y Vivienda de Puerto Rico,* 453 F.2d 794 (CA1 1972).

*Camenisch*, 451 U.S. at 395.

Similarly, in this case, the Eleventh Circuit only discussed the issue of an improper filing in the context of its 60(b) analysis, and only concluded that the June 17-19 emails were "likely to produce a different result on Wortley's motion to dismiss." Eleventh Circuit Opinion (Ex. D1-Y) at p. 14. Nowhere in its decision did the Eleventh Circuit ever rule on the underlying merits of the motion to dismiss and it never ordered the bankruptcy court to dismiss this case.[11]

The Eleventh Circuit only discussed the issue of an improper filing in the context of its 60(b)(2) analysis—namely the application of the third through fifth factors of the 60(b)(2) test. Its decision largely focused on the Defendants' alleged failure to timely produce documents and certain alleged misrepresentations to the bankruptcy court concerning those documents. The Eleventh Circuit was exclusively dealing with alleged discovery abuses and any fees it ordered to be awarded could only have been related to such alleged discovery abuses and not based on a "likely" bad faith filing determination made solely in connection with its 60(b)(2) analysis. Wortley's own expert agrees with conclusion stating, "I think what precipitated the appeal and the 60(b) motion were the emails; that they were withheld and its new evidence and for all the factors I mentioned why those should be considered. So, that was the basis for their decision;

---

[11] See, also, *Aleknagik Natives Ltd. v. Andrus*, 648 F.2d 496 (9th Cir. 1980) ("We must, at the outset, emphasize the procedural posture of this case. Although the Secretary characterizes our decision [which requires the lower court to issue a preliminary injunction] as having ordered him to convey the challenged land to the plaintiffs, our decision merely requires that the status quo be maintained until this suit can be resolved on the merits. It is true that the plaintiffs have demonstrated a strong likelihood of success on the merits, but it still remains to be decided whether they will ultimately prevail.") (emphasis added).

was the withheld emails." See Transcript of Steven Davis, Esq. Depo (Ex. D1-U8), p. 216, lines 22-25, p. 217, line 1.

Any other interpretation would be illogical because it would mean that the Eleventh Circuit intended to (1) grant substantive relief well beyond that permissible in an appeal of a Rule 60(b) motion denial; (2) deny the Defendants' fundamental due process; (3) act as a fact-finding tribunal; (4) cause judgments to be entered against non-parties without their ever having been heard; (5) reverse final orders that were never appealed; (6) violate express provisions of the Bankruptcy Code; and (7) run afoul of Supreme Court precedent. The Eleventh Circuit could not have intended such results—especially where Wortley's requested relief solely sought a remand for the bankruptcy court to hold an evidentiary hearing to consider the alleged "newly discovered evidence." See Wortley Init. Br. (Ex. D1-X) at pp. 16-18, 36. The Eleventh Circuit's remand for an "appropriate hearing" can only mean one thing: Defendants must be given their day in court and the only attorney's fees to be awarded are solely in connection with the perceived discovery abuses.

### B. The bankruptcy was not filed in bad faith

As set forth in greater detail above, Global never produced one cent in revenue and only had losses. By mid-May, 2010, Global was out of cash and was not paying its debts as they became due. It did not pay its vendors and missed its employees' payroll that was due May 21, 2010. Its main inventor, Jim Juranitch, the person whose technology the company was based upon, had vacated Global's premises and taken all of its employees with him. Global's Chief Engineer had also quit. Suppliers were demanding the return of their equipment and the company was out of cash. In Wortley's own words, Global was a "mess" "trashed" and

"exploded."  Even Wortley scrambled to attempt to secure his promissory note that was in default.

To make matters worse, Global's management was hopelessly deadlocked.  Juranitch was "nowhere to be found."  Juranitch and Wortley were not even speaking and Juranitch informed Tarrant that he would never work with Wortley.  Without Juranitch and Wortley's mutual consent, the requisite 75% voting interest needed to take any corporate action could never be achieved.  Simply put, Global was broke and its management was not speaking and deadlocked.

With Global dead, the prospect of Chrispus having its loan repaid was bleak.  Chrispus tried and tried to break the deadlock between Juranitch and Wortley over the 6-week period leading up to the filing of the involuntary petition.  First, it offered to buy Wortley out and pay him the money he was owed.  Wortley refused.  Next it requested Wortley to buy it out.  Again, Wortley refused.  It then attempted to split up Global by giving Wortley part of the corporation, but that too was to no avail.  Chrispus then approached Wortley on several occasions to have him put Gates in Global's management in an effort to break the deadlock.  Once again, Wortley did not respond, but instead continued to take the "let him stew" attitude as Global stayed dormant.

The evidence indicates that Chrispus continued to attempt to bring the parties together to resurrect Global even after the bankruptcy.  <u>This evidence directly contradicts any conclusion that the bankruptcy was filed for an improper purpose or used in order to wrest control of Global and its assets away from Wortley.</u>  Clearly, the Eleventh Circuit never saw the full and true story, as this is the first time the Defendants have had the opportunity to put these facts in the record.

42211712;3

Moreover, Wortley's misrepresentation of the facts to the Eleventh Circuit and his intentional omission of relevant portions of emails duped the Eleventh Circuit.[12]

Under any test recognized by the Eleventh Circuit, this bankruptcy was not filed in bad faith. First, as the undisputed evidence indicates, Chrispus filed the bankruptcy because Global was broke and "exploded" and was not paying its debts as they became due—including its employees, vendors and even the loan owed to Wortley. See 11 USC §303(h) (requiring court to enter order for relief if, in part, debtor not paying its debts as such become due). Moreover, the bankruptcy was necessary in order to have a shot at breaking the deadlock that crippled Global. See, e.g. *In re CorrLine Intern., LLC*, 516 B.R. 106 (Bankr. S.D. Tex. 2014) (Bankruptcy court would not abstain from hearing an involuntary Chapter 7 case filed by a creditor, also a minority shareholder of debtor limited liability company, given the current deadlock in debtor-LLC's board of managers, which impeded its ability to continue as a viable entity); *In re New Towne Dev. Group, L.L.C.*, 09-10029, 2010 WL 1451480 (Bankr. M.D. La. Apr. 9, 2010) (Petitioning creditors were entitled to an administrative expense claim for attorney fees incurred in filing an involuntary Chapter 11 petition and in resisting motion to dismiss the case; the Bankruptcy Court found that the case record evidenced that the involuntary petition benefitted the estate by breaking the prepetition deadlock in the debtor's management and putting the debtor's assets in the hands of the trustee); *In re Bel-Aire Investments, Inc.,* 97 B.R. 88 (Bankr. M.D. Fla. 1989) (Bankruptcy Court dismissed a voluntary Chapter 11 filing as unauthorized, but acknowledged that the putative-debtor, a corporation, was no longer able to function as a result of management deadlock, and concluded that qualifying creditors may file an involuntary petition against the corporation pursuant to § 303 of the Bankruptcy Code). Even Wortley recognizes this as a

---

[12] Tarrant, Juranitch, Pugatch and RPRS were not parties to the bankruptcy or the appeal and could not appeal the Eleventh Circuit's decision.

proper purpose.  See (D.E. 12) (Ex. D1-L9) at ¶2.

**C. *Tarrant, Chrispus, and Juranitch have not profited from this bankruptcy or from Chrispus' purchase of Global's assets***

Tarrant, Chrispus and Juranitch have not profited from the filing of this bankruptcy or from Chrispus' purchase of Global's assets.  To the contrary, as the evidence indicates and the expert's report confirms, Chrispus lost approximately $1.75 million in its dealings with Global and the Trustee ($1,026,000 prior to the bankruptcy and $750,000 in its purchase of Global's assets from the Trustee that has been wrongfully stripped away).  See Expert Report of Richard A. Pollack (Ex. D1-X8).  Moreover, Chrispus has lost over $24 million in its subsequent investments with Juranitch—even though those investments are totally unrelated to Global.  *Id*. This loss extends to Chrispus' investment in Plasma Power, LLC ("Plasma"), an entity which Wortley claims is Global's alter ego.  But, as the evidence indicates, Plasma does not engage in the business of either carbon sequestration or biofuels and does not use any of the same patents (or even similar ones) that Global allegedly owned.  See Expert Report of Ryan O'Connor (Ex. D1-W8).

In this regard, even if Plasma Power were in the business of carbon sequestration or biofuels (which it is not), there was only ever one single patent assignment relative to this (or any) field made by and between Global and Juranitch.  *Id.*[13]  That patent is lapsed, was never used, and Wortley is welcome to have it.[14]  Global's Amended and Restated Operating Agreement states, in pertinent part:

> James Juranitch, hereby ***agrees to transfer*** into this Company all
> rights to and interest in the intellectual property rights of the

---

[13] In fact, that assignment was from Global *to Juranitch*, not vice versa. *Id.*

[14] Juranitch will testify to this at trial.

invention titled "Recycling and reburning Carbon Dioxide in an energy efficient way," as further detailed in Exhibit B;[15] and all research and development work that has been done in the field of Production of Biofuels and/or Capturing Carbon Dioxide (CO2) from the atmosphere or production facilities, and further detailed in Exhibit C.[16] (Emphasis added).

See (Ex. D1-D), at §2.1a.

It is well-settled that an agreement to transfer intellectual property *in the future* does not convey or imbue in the promisee any right or title to such intellectual property until an actual conveyance is later made. In *Board of Trustees of the Leland Stanford Junior University vs. Roche Molecular Systems, et. al.*, 563 U.S. 776 (2011), a scientist (Dr. Holodniy) joined Stanford as a research fellow. In doing so, he executed a Copyright and Patent Agreement, in which he **"agree[d] to assign"** to Stanford all right, title, and interest in inventions resulting from his employment with the university. *Id*. at 781. Dr. Holodniy's research involved detecting HIV levels in blood, and his supervisors at Stanford arranged for him to conduct research at Cetus (a lab that had developed a method of such detection, which was later acquired by Roche). *Id*. As a condition of gaining access to Cetus, Holodniy executed a Visitor's Confidentiality Agreement, stating that he **"does hereby assign"** to Cetus his right, title, and interest in any ideas, inventions, or improvements developed as a consequence of his access to Cetus. *Id*.

Holodniy ultimately developed HIV detection techniques; after his techniques were developed, Stanford obtained an actual assignment of those techniques, and patented them. *Id*.

---

[15] Exhibit B states: "Recycling and Reburning Carbon Dioxide in an Energy Efficient Way."

[16] Exhibit C states: Includes all research, development, prototyping, production and distribution work in the development of Biofuels, regardless of end use purpose; both in the present and all future development and intellectual property rights related to Biofuels. Also includes all intellectual property rights, including but not limited to research, development, prototyping, production and distribution work in the development of Carbon Dioxide Recovery and sequestering systems technologies; both in the present and all future development and intellectual property rights related to biofuels.

Cetus was ultimately acquired by Roche which, using technologies developed by Holodniy (and related to work he did at Cetus) commercialized an HIV detection procedure, selling HIV test kits used worldwide. *Id*. at 782. Stanford sued Roche, asserting that its HIV test kits infringe on Stanford's patents.  In ruling against Stanford, and in favor of Roche, the U.S. Supreme Court affirmed the finding of the Circuit Court that Holodniy's initial agreement with Stanford (in the Copyright and Patent Agreement) was **a mere promise to assign rights in the future**. *Id*. at 784.[17]  Accordingly, the Copyright and Patent Agreement conveyed nothing to Stanford at all, whereas Cetus' Visitor's Confidentiality Agreement was an actual present assignment of rights to Cetus. *Id*.

This principle – that the individual human inventor owns his invention until the moment that he actually assigns it – dates to the Patent Act of 1790, enshrining the basic principle that an inventor holds the right to patent his own inventions.  *Id*. at 785.  Unless and until actually assigned, inventions remain the property of "the single human inventor."[18]  Holodniy's promise "to assign" his inventions to Stanford did not vest any ownership rights in Stanford whatsoever, and it was therefore unable to pursue any patent infringement actions against Cetus, whose actual assignment predated any actual assignment to Stanford.

This concept is neither new nor novel, and courts have repeatedly affirmed the basic principal that a promise *to assign* intellectual property does not vest any ownership rights in the

---

[17] Whereas the Visitor's Confidentiality Agreement executed with Cetus was an actual present assignment of rights to Cetus. *Id*.

[18] *Id*. at 785-786, *citing Gayler v. Wilder*, 51 U.S.(10 How. 477), 493, 13 L.Ed. 504 (1851)("the discoverer of a new and useful improvement is vested by law with an inchoate right to its exclusive use, which he may perfect and make absolute by proceeding in the manner which the law requires"); *Solomons v. United States*, 137 U.S. 342, 346(1890)("whatever invention [an inventor] may thus conceive and perfect is his individual property"); *United States v. Dubilier Condenser Corp*., 289 U.S. 178, 188, (1933) (an inventor owns "the product of [his] original thought").  The treatises are to the same effect.  See, *e.g.,* 8 Chisum on Patents § 22.01, p. 22–2 (2011) ("The presumptive owner of the property right in a patentable invention is the single human inventor").

promisee, and is merely a promise to assign at some time in the future.  *See, e.g.*, *IpVenture, Inc. v. ProStar Computer, Inc.,* 503 F.3d 1324, 1327 (Fed. Cir. 2007) (interpreting "agree to assign" as "an agreement to assign," requiring a subsequent written instrument); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364-65 (Fed. Cir. 2010) (agreements that obligate an inventor to grant rights in the future do not automatically vest legal title to an invention); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580-81 (Fed. Cir. 1991) (agreement providing that invention rights "will be assigned" does not create "a present assignment of an expectant interest").  Here, there is no overlap between the technologies used by Plasma Power post-bankruptcy, and those in which Global was involved.  Moreover, other than one patent (which was never used), Global was never actually assigned any intellectual property whatsoever.  Accordingly, Global never obtained any rights in Juranitch's patents and they never became property of Global's bankruptcy estate.  See 11 U.S.C. §541(a)(1)(property of the estate consists of "all legal and equitable interest of the debtor in property as of the commencement of the case.").  Therefore, when the Trustee sold Global's assets, Chrispus never acquired Juranitch's patents.  Wortley himself acknowledges that Chrispus could not purchase from the Trustee intellectual property that Global did not own.  Wortley Depo p. 34, lines 18-20.  Thus, any claims that Defendants utilized the bankruptcy to acquire the patents in an effort to deprive Wortley of their value necessarily fails.  There is zero profit arising out of the involuntary bankruptcy to disgorge from Chrispus and/or Tarrant and/or Juranitch, and Wortley does not have any evidence to the contrary.

### D.  *Wortley has not suffered any damages as a result of any actions of Defendants*

Again, Global was "exploded" and "trashed" as of May, 2010.  It was out of cash, had no employees and its main inventor left.  Global never had any revenue and never made any profit.

Simply put, although the parties may have previously been optimistic about Global's potential, by May 2010 Global was dead and Wortley's investment in Global was worthless. Therefore, Wortley cannot prove that his alleged conspiracy by the Defendants to file an involuntary bankruptcy caused him damage. As such, Wortley is not legally entitled to any damages. See, *Humana, Inc. v. Castillo*, 728 So. 2d 261 (Fla. 2d DCA 1999) (If a plaintiff claims fraud, but cannot demonstrate a causal connection between the defendant's conduct and the plaintiffs' injury, the plaintiff cannot recover.)[19]

The only alleged "evidence" of damages that Wortley points to is a supposed expert report prepared by Michiel McCarty ("McCarty").[20] However, McCarty's opinion is totally speculative, based on outdated facts, and not based on any recognized scientific methodology. In short, McCarty's report is based on his assumption that the best value for Global in June 2010 would have been to merge it with a company called SES in order to use some excess cash SES had to "*further develop*" Global's technology. See McCarty Report (Adv. D.E. 309) at ¶ 17. McCarty concludes that if Global merged with SES its value "<u>could have</u> been higher." *Id*. (emphasis added).

McCarty's opinions are not credible and should be given little weight for several reasons. First, McCarty's report is primarily based on hearsay and on very limited diligence that he performed in August 2009—nearly 10 months prior to Global's collapse and at a time when Juranitch was still working at Global and Global still had funding. By the time the bankruptcy occurred Global had already "exploded," thereby making the prospects of a merger doubtful.

---

[19]  The Amended and Restated Operating Agreement is governed by Florida law. See Amended and Restated Operating Agreement (Ex. D1-D) at §9.3. Moreover, it is undisputed that all the parties and all material acts complained of occurred in Florida.

[20]  Curiously, at his deposition which took place on July 6, 2017, neither McCarty nor Wortley would inform the Defendants if he was testifying as an expert or fact witness.

Second, any potential merger with SES was rejected for legitimate business reasons wholly unrelated to the bankruptcy by Global in August 2009—10 months prior to the bankruptcy. See (Ex. D1-D2). As such, the requisite causation between the alleged improper filing and the failure of any proposed merger is lacking.

Moreover, McCarty's conclusions are wholly speculative and any damages based on his purely speculative opinion are also unrecoverable. *Zenith v. Hazeltine*, 401 U.S. 321, 339 (1971) ("it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.") In fact, an argument can be made that the bankruptcy actually saved Wortley from incurring damages because if Global continued to exist Wortley would have been responsible for funding his proportional share of its future debts.

McCarty's opinion does not qualify as a valid expert opinion. The test for admissibility of expert testimony under Rule 702 is an "exacting" one. *Weisgram v. Marley Co*., 528 U.S. 440, 442 (2000). The Supreme Court has made clear that under Rule 702, courts must serve as "gatekeep[er]s" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" before admitting or considering the testimony for any purpose. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589, 597 (1993); see also *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 148-51 (1999). As the Supreme Court explained in *Daubert*, Rule 702's "helpfulness" standard "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." 509 U.S. at 591-92. The proponent of the expert testimony bears the burden of showing by a preponderance of the evidence that proffered expert testimony is

both relevant and reliable.  *Oddi v. Ford Motor Co*., 234 F.3d 136, 145-46 (3d Cir. 2000); *In re W.R. Grace & Co.*, 355 B.R. 462, 471-72 (Bankr. D.Del. 2006).

An expert's testimony must be more than subjective belief or unsupported speculation. See *In re TMI Litig.*, 193 F.3d at 670; *Calhoun v. Yamaha Motor Corp*., 350 F.3d 316, 323 (3d Cir. 2003); see also *Ammons v. Aramark Uniform Servs., Inc*., 368 F.3d 809, 816 (7th Cir. 2004) (upholding exclusion of expert opinion that "was nothing more than speculation"). And the Supreme Court has reasoned that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Oddi*, 234 F.3d at 158.  McCarty's opinion fails to meet this exacting standard as it only consists of speculation that had Global merged with SES or some other entity its value "could have been higher."  He fails to inform the Court, because he does not know, that Global was not even considering merging with SES.   See (Ex. D1-D2).  As such, his report is wholly speculative and should be rejected.

**E.  *At best, Wortley is only entitled to legal fees caused solely by the alleged failure to timely produce documents***

In the end, this case simply comes down to whether or not Wortley is entitled to be reimbursed his attorney's fees, and the scope and reasonableness of any such award.  Wortley claims that he is entitled to every dollar of attorney's fees he has incurred to date and in every forum regardless of how unreasonable they are.  In fact, he filed a Petition for Writ of Mandamus with the Eleventh Circuit claiming such and alleging that this Court was not properly following the Eleventh Circuit's mandate because it intended to consider his entitlement to fees.  As indicated by its denial of his Petition for Writ of Mandamus, the Eleventh Circuit disagrees with

Wortley.  More importantly, however, Supreme Court case law indicates that Wortley is wrong, and that at best, he is only entitled to those fees he incurred **solely** as a result of the Defendant's alleged failure to produce the June 17-19 Emails.

### 1. *A Court's Inherent Authority to Award Attorneys' Fees and Costs as a Sanction for Bad-Faith is One Exception to The American Rule*

"Our system generally requires each party to bear his own litigation expenses, including attorney's fees, regardless whether he wins or loses.  Indeed, this principle is so firmly entrenched that it is known as the 'American Rule.'"  *Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011) citing to *Aleyska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975); see also *Baker Botts L.L.P. v. Asarco LLC*, 135 S. Ct. 2158, 2164 (2015) (explaining the bedrock principle when considering the award of attorney's fees is the American Rule that each litigant pays its own attorneys' fees, win or lose, unless a statute or contract provides otherwise).  There are however certain circumstances in which courts may deviate from this American Rule.  For example, there are certain statutes which specifically authorize fee shifting.  A review of the Eleventh Circuit's opinion indicates that it did not rely on any statute in awarding Wortley attorney's fees.

Another exception to the American Rule is based upon the inherent authority of all federal courts, including bankruptcy courts, to award a sanction when a party has acted in bad faith.  See generally *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *Marrama v. Citizens Bank of Mass.*, 127 S. Ct. 1105, 1116 (2007) (noting that even in the absence of a textual basis, a bankruptcy court maintains inherent authority to sanction abusive litigation practices); *In re Walker*, 532 F. 3d 1304, 1309 (11th Cir. 2008) (explaining that "[f]ederal courts, including bankruptcy courts, have the inherent power to impose sanctions on parties and lawyers").  This

inherent authority, not conferred by rule or statute, derives from a court's general need and power to manage its own affairs so as to achieve the orderly and expeditious disposition of cases. See *Goodyear Tire & Rubber Co. v. Haeger*, ___ S. Ct. ___, No. 15-1406, 2017 WL 1377379, at *5 (Apr. 18, 2017) citing to *Link v. Wabash R. Co.,*  370 U. S. 626, 630-631 (1962).   That general authority more specifically can include "the ability to fashion an appropriate sanction for conduct which abuses the judicial process" including an assessment of attorney's fees. *Chambers*, 501 U.S. at 44-45.   Presumably, the Eleventh Circuit was acting on its inherent authority when it determined that Wortley should be compensated for his attorney's fees. Wortley's own expert agrees with this presumption.  See Davis Depo (Ex. D1-U8) at p. 65, lines 21-24.

## 2. *Sanctions Pursuant to Inherent Authority Must Be Imposed With Restraint*

To impose sanctions under inherent powers, a court must find bad faith and must afford the sanctioned party due process in determining that the requisite bad faith exists in assessing fees.  *In re Walker*, 532 F.3d at 1309-10.  "Because of their very potency, inherent powers must be exercised with restraint and discretion."  *Chambers*, 501 U.S. at 44-45, 50 (explaining that a court must exercise caution in invoking its inherent power, and must comply with the mandates of due process); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980) ("Like other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record".).  This trial is where the Defendants, most of whom were not even parties to the underlying bankruptcy or appeal, will finally be afforded due process.[21]

---

[21] This is consistent with the Eleventh Circuit's opinion which required the parties to have an "appropriate hearing."

### 3. *Sanctions Pursuant to Inherent Authority Must Be Compensatory*

A sanction pursuant to a court's inherent powers, not conferred by rule or statute, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature.  See *Goodyear Tire*, 2017 WL 1377379, at \*5; *Mine Workers v. Bagwell*, 512 U.S. 821, 826-830 (1994) (distinguishing compensatory from punitive sanctions and specifying the procedures needed to impose each).  To level a penalty beyond compensation, a court would need to provide procedural guarantees applicable in criminal cases.  See *Mine Workers*, 512 U. S. at 826, 832-834, 838-839.   An award intended to retrospectively punish, rather than compensate, for behavior after one has already complied is punitive in the nature of a criminal sanction.  See, e.g. *Goodyear Tire*, 2017 WL 1377379, at \*5-6 (to level a penalty beyond redressing a wronged party for only losses sustained, a court would need to provide procedural guarantees applicable in criminal cases and when those criminal-type protections are missing, a court's shifting of fees is limited to reimbursing the victim); *U.S. v. City of Miami*, 195 F.3d 1292, 1298 (11th Cir. 1999) (equating punitive sanctions and criminal contempt and finding that both require many of the due process safeguards afforded to defendants in criminal proceedings).

To determine that a sanction is compensatory, as opposed to punitive, the Supreme Court explained as follows:

> [A] sanction counts as compensatory only if it is 'calibrate[d] to [the] damages caused by' the bad faith acts on which it is based. …A fee award is so calibrated if it covers the legal bills that the litigation abuse occasioned. But if an award extends further than that—to fees that would have been incurred without the misconduct—then it crosses the boundary from compensation to punishment.' … 'That means, pretty much by definition, that the court can shift only those attorney's fees incurred because of the misconduct at issue…. ..

*Goodyear Tire*, 2017 WL 1377379, at \*5 (internal citations omitted).

Hence, in order to ensure that a sanction is compensatory and not punitive when using its inherent sanctioning authority, <u>a court must establish a causal link between the litigant's misbehavior and legal fees paid by the opposing party</u>. *Id*. (emphasis added).

### 4. Inherent Authority to Sanction Must Be Limited to Fees Incurred Solely Because of the Misconduct

In a recent unanimous opinion delivered on April 18, 2017, the Supreme Court provides clear direction that a federal court's inherent authority to sanction a litigant for bad-faith conduct by ordering it to pay the other side's attorneys' fees must be "limited to the fees the innocent party incurred **solely** because of the misconduct--or put another way, to the fees that party would not have incurred but for the bad faith." *Goodyear Tire*, 2017 WL 1377379, at *1 (emphasis supplied). In *Goodyear Tire*, a couple, the Haegers, alleged that the failure of a Goodyear tire caused their family's motorhome to swerve off the road and flip. *Id*. at *2. After several years of contentious discovery, the parties settled the case. *Id*. Some months after settlement, the Haegers learned that Goodyear had withheld a certain relevant heat test even though all the relevant testing data had been requested by the Haegers. *Id*. The Haegers then sought sanctions for discovery misconduct and the district court, exercising its inherent power to sanction bad-faith behavior, awarded the Haegers the entire sums they spent in legal fees and costs since the moment, early in the litigation, when Goodyear first made its first dishonest discovery response. *Id*. at *2-3. The Ninth Circuit affirmed the full award of all the fees the Haegers had incurred during the time when Goodyear was acting in bad faith. *Id*. at *4.

The Supreme Court reversed. As the Court explained, a fee award must only cover legal bills that the litigation abuse occasioned because, if extended any further, the award would otherwise cross the boundary from compensation to punishment. *Id*. at *5-6. Consequently, a

court must establish a causal link between the litigant's misbehavior and the legal fees paid by the opposing party when a court is using its inherent sanctioning authority. *Id*. at *6. For this reason, the Court in *Goodyear Tire* held that the award of fees could not stand because the district court and appellate court failed to use the appropriate standard finding a causal link between the misconduct and the fees. *Id*. at *10-11. As the Court observed, "the Haegers cannot demonstrate that Goodyear's non-disclosure so permeated the suit as to make that misconduct a but-for cause of every subsequent legal expense…" *Id*. at *12.

Thus, as directed by the Supreme Court, the only relevant standard is that a "sanctioning court must determine which fees were incurred because of, and solely because of, the misconduct at issue…" *Id*. at *11 (emphasis added). Any sort of temporal test, such as awarding fees from a time once a discovery violation occurs, is inappropriate. *Id*. Moreover, any sort of award of fees for an entire litigation because of the level of egregiousness is inappropriate. *Id*. at *10.

**5.** ***A Court Has Discretion to Calculate Fee Award Pursuant to Inherent Authority As Long as Fees Are Limited to Those Resulting Solely From the Misconduct***

A court has "broad discretion" to calculate fee awards pursuant to a federal court's inherent authority to sanction a litigant for bad-faith conduct as long as the legal fees do not go beyond those resulting from the litigation misconduct. *Goodyear Tire*, 2017 WL 1377379 at *1. "The court's fundamental job is to determine whether a given legal fee….would or would not have been incurred in the absence of the sanctioned conduct. The award is then the sum total of the fees that, except for the misbehavior, would not have accrued." *Id*. at *8. A standard allowing more expansive fee-shifting than compensation would otherwise furnish windfalls to some defendants, making them better off because they were subject to the complained-of misconduct. *Fox*, 131 S. Ct. at 2215-16.

To this end, a court need not achieve auditing perfection and may use estimates in calculating and allocating an attorney's time in order to do "rough justice". *Id*. at 2216. As instructed by the Supreme Court, appellate courts must give substantial deference to these determinations in light of the lower court's superior understanding of the litigation and, as observed by the Court, "[w]e can hardly think of a sphere of judicial decision-making in which appellate micromanagement has less to recommend it." *Id*. ("That means the trial court must determine whether the fees requested would not have accrued but for the frivolous claim. And the appeals court must determine whether the trial court asked and answered that question, rather than some other. A trial court has wide discretion when, but only when, it calls the game by the right rules.")

### 6. *A Bankruptcy Court's Inherent Powers May Not Contravene Specific Statutes*

Bankruptcy courts possess inherent powers to sanction abusive litigation practices but, in exercising those inherent powers, a bankruptcy court may not contravene specific statutory provisions. *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014). Bankruptcy courts' inherent sanctioning powers are subordinate to valid statutory directives and prohibitions. *Id*. at 1194-1195 (explaining that it has long been held that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code); *see also Baker Botts LLP* 135 S. Ct. at 2162 (explaining that Congress has not granted courts "roving authority" to allow counsel fees whenever a court might deem them warranted).

**7.    *Authority Pursuant to 11 U.S.C. §105(a) to Award Attorneys' Fees As Sanction for Discovery Misconduct is Limited in the Same Way As Sanctions Pursuant to Inherent Authority***

A bankruptcy court has statutory authority to issue any order process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code pursuant to 11 U.S.C. §105(a).  The analysis as to the scope of compensatory attorneys' fees and costs whether awarded pursuant to §105 or a court's inherent authority would be identical.  Rule-based and statutory sanction regimes, just like sanctions pursuant to a court's inherent authority, require courts to find a causal connection before shifting fees.  *Goodyear Tire*, 2017 WL 1377379, at *6, n.5.  In addition, just like sanctions pursuant to a court's inherent authority as discussed above, in exercising this statutory power, a bankruptcy court may not contravene specific statutory provisions.   *Siegel*, 134 S. Ct. at 1194.  "It is hornbook law that §105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code."  *Id*.; see also e.g. *In Re Martinez*, 515 B.R. 383, 384, 386 (Bankr. S.D. Fla. 2014) (explaining that Supreme Court's controlling precedent prohibits bankruptcy courts from using §105's equitable power to obtain a result contrary to an unambiguous Bankruptcy Code section and that "§105(a) is not a panacea to correct judge-perceived legislative mistakes.")  Thus, the analysis would remain the same regarding the scope of attorneys' fees and costs that could be compensable as a sanction whether the sanction is based upon a bankruptcy court's inherent authority to sanction or under §105(a), as neither of these scenarios are a fee-shifting statute, both require a causal connection between the fees and the misconduct, and neither can contravene an existing statute.

**F.  *Applying Legal Authority of a Court's Inherent Sanction Power to the Facts of this Case Indicates Compensation for Only Those Fees and Costs Caused Solely by the Discovery Misconduct Regarding the June 17-19 Emails***

**1.  *Compensatory Sanctions Pursuant to a Court's Inherent Authority Must be for Fees and Costs Solely Caused by the Withholding of the June 17-19 Emails***

The Eleventh Circuit in *In Re Global Energies*, not relying on any stated rule or statute for fee-shifting, instructed this Court that, upon remand, it is to award sanctions to "ensure that [Wortley] is fully compensated for any and all damages, including awarding Wortley attorneys' fees and costs."  763 F.3d at 1350.  Again, the Eleventh Circuit was presumably instructing this Court to utilize its inherent power, not conferred by rule or statute, to permissibly fashion an appropriate sanction for perceived bad faith discovery misconduct.  In this regard, the remand instructions appropriately directed a compensatory, rather than a punitive, sanction.  *Id.* (holding that the sanction is to ensure that Wortley "is fully <u>compensated</u> for any and all damages, including awarding Wortley attorneys' fees and costs.") (emphasis added).

The misconduct at issue for which Wortley was to be compensated was the alleged withholding of the discovery of the June 17-19 Emails and, consequently, only fees and costs solely caused by that withholding are compensable.[22]  See generally *Goodyear Tire*, 2017 WL 1377379.  As set forth in greater detail, *supra*, the Eleventh Circuit's opinion solely dealt with the issue of whether the June 17-19 Emails were newly discovered evidence and any reference to an improper bankruptcy was solely in the context of its 60(b) analysis.  See *In re Global*, 763 F.3d at 1350.  Procedurally, although Wortley moved to dismiss the underlying bankruptcy case under §1112, he never appealed the order denying that motion and the sole order on appeal

---

[22] As further discussed, *infra*, the Eleventh Circuit could not have intended this court to award Wortley attorneys' fees for a bad faith involuntary filing because such direction would clearly violate *Law v. Siegel's* prohibition against using inherent authority to circumvent statutory prohibitions.  As the court is well aware and has already determined in its order granting the Defendants' motion to dismiss (D.E. 85), any §303(i) claim was waived and is no longer available under the express language of §303(i).

before the Eleventh Circuit was the order denying his 60(b)(2) motion for rehearing. Thus, because the Eleventh Circuit's Opinion solely regarded the application of Rule 60(b)(2), its instructions upon remand regarding attorneys' fees and cost could only have been aimed to compensate Wortley for the perceived discovery misconduct which had occasioned the need for the opinion, namely the withholding of the June 17-19 Emails. See generally *In re Global*, 763 F.3d at 1350; see also generally *Goodyear Tire*, 2017 WL 1377379 (only fees and costs solely caused by the discovery withholding misconduct are compensable.)

The appropriate test for scope of these compensatory attorneys' fees and costs is for the court to determine whether a given legal fee would or would not have been incurred in the absence of the sanctioned conduct of withholding the June 17-19 Emails, or, in other words, the sanction of attorneys' fees and costs must be limited to the fees Wortley incurred solely because of the misconduct of withholding the June 17-19 Emails. See *Goodyear Tire*, 2017 WL 1377379 at *1, 8. In accordance with this test, the only attorneys' fees and costs which could be considered to have been incurred solely because of the withholding of the June 17-19 Emails must have occurred after the November 9, 2010 response date to the discovery request to which the June 17-19 Emails may have been responsive. Similarly, once the June 17-19 Emails were produced and available to Wortley, fees for any litigation unrelated to the discovery misconduct in not producing the June 17-19 Emails would not be appropriate compensation. Once known, Wortley no longer suffered any detriment or disadvantage regarding the withholding of the June 17-19 Emails. The fact that the June 17-19 Emails were available to Wortley and could have been used at the September 2011 trial on his Second Motion to Dismiss but his counsel did not act with diligence is not chargeable to Defendants. Further, it is obvious based upon this Court's prior rulings that if such emails had been admitted into evidence on September 20, 2011 they

41

would not have changed the Court's ruling and so any fees incurred in appealing the Court's decision or otherwise after that point should not be chargeable to Defendants. See Transcript of May 24, 2012 Hearing (D.E. 485); (Ex. D1-X9), pp. 7-9, and 21-22.

The only attorneys' fees and costs for which Wortley can be compensated as having incurred solely because of the discovery misconduct could only have been incurred from November 9, 2010 (the response date of his document request) through June 2011 (the date the documents were produced and made available to Wortley).[23]  Once Wortley had obtained or should have obtained the June 17-19 Emails, he was no longer incurring legal fees caused by the alleged discovery misconduct.

The complained-of misconduct in this case would not permit or warrant shifting the entire cost of litigation in one fell swoop.  The alleged misconduct in this case does not rise to the level of an exceptional situation in which the entire cost of the litigation could be shifted without a fee-shifting statute and in contravention of the American Rule.  This case is not one of continuing misconduct and constant contemptuous behavior, see, e.g. *Chambers*, 501 U.S. 32 (continuous and repeated contemptuous conduct in violating court's orders warranting fees for entire case) as the misconduct complained of in this case was the alleged wrongful withholding of the June 17-19 Emails.  See *Goodyear Tire*, 2017 WL 1377379 at * 5-6; 12 (attorneys' fees for the discovery misconduct of withholding evidence must be limited to only those fees that the litigation abuse occasioned and "Goodyear's non-disclosure did not so permeate the suit as to make that misconduct a but-for cause of every subsequent legal expense").  In addition, compensatory sanctions for the misconduct in withholding the June 17-19 Emails pursuant to the bankruptcy court's inherent authority should not include fees resulting from the filing of the

---

[23] At trial, Defendants' fee expert, Charles Throckmorton, Esq. will testify as to the specific tasks and fees incurred that may be recoverable during the relevant time period.

involuntary petition because (in addition to being in direct contravention of § 303 as discussed further below), such fees are not causally linked to the discovery misconduct. At the time the involuntary petition was filed, the discovery at issue had not yet been requested.

### 2. *Compensatory Sanctions for the Misconduct in Withholding the June 17-19 Emails Pursuant to a Court's Inherent Authority Should Not Include Any Appellate Level Fees and Costs*

The fees and costs associated with the appeals of Wortley's Motion for Rehearing (nor any other appeals) are not reimbursable to Wortley as compensation pursuant to the bankruptcy court's inherent authority. For one thing, the appeals were not solely the result of the alleged discovery misconduct, but rather, as found by the Eleventh Circuit, were a result of the bankruptcy court's alleged errors in application of the Rule 60(b)(2).[24] See *In re Global*, 763 F.3d at 1350. Thus, the appeal was not caused solely by the failure to produce the June 17-19 Emails and did not constitute further misconduct, and therefore, should not be considered fees and costs for which Wortley is to be compensated. See also generally *In re Clay*, 334 B.R. 623, 626 (Bankr. C.D. Ill. 2005) (disagreeing with the Debtor's counsel's argument that the additional fees for appeals can be awarded pursuant to the original finding of contempt and finding that "[a]lthough it is clear that this Court can punish contempt, this Court does not find that [the] appeal of the prior contempt order constituted further contempt which would be punishable by further sanctions"). In fact, even Wortley agrees that the appeal of the 60(b) motion was not caused by the Defendants' alleged discovery misconduct, but rather by the court's denial of his 60(b) motion. See Wortley Depo at p. 446, lines 2-20; p. 447, lines 1-4.

Moreover, as in *In Re Lapides*, No. 09-45327-NCD (Bankr. D. Minn. Jan. 7, 2016), it has been held that a bankruptcy court is precluded from awarding appellate attorneys' fees by the

---

[24] Defendants disagree with the Eleventh Circuit's conclusion and believe the bankruptcy court was correct.

Federal Rules of Appellate Procedure 38 and Federal Rule of Bankruptcy Procedure 8020, because awarding appellate attorneys' fees is to be considered solely a function of the appellate courts. See also *Cooter & Gell v. Hartmaarx Corp.*, 496 U.S. 384, 409-09 (1990) (explaining that the sanctions provision of Rule 11 did not authorize the award of attorney's fees incurred on appeal as Rule 11 is not a fee-shifting statute). Thus, because the Eleventh Circuit's instructions for sanctions upon remand is based upon the inherent sanctioning authority of the bankruptcy court and not upon an explicit fee-shifting statutory authority or appellate rules, appellate fees are not an appropriate portion of the sanction.

### 3. Compensatory Sanctions for the Misconduct in Withholding the June 17-19 Emails Pursuant to a Court's Inherent Authority Should Not Include Any Fees Incurred in the State Court Proceeding

The fees associated with Wortley's state court lawsuit are also not compensatory as such fees were not caused solely by the alleged withholding of the June 17-19 Emails. Wortley filed his state court lawsuit in October, 2010. Wortley Depo at p. 447, lines 19-21. This was prior to his discovery request in the bankruptcy court wherein he requested the June 17-19 Emails. Wortley Depo p. 448, lines 1-5; p. 449, lines 15-19. In fact, Wortley admits that his state court lawsuit is unrelated to the bankruptcy filing or the withholding of the June 17-19 Emails and that he would have sued Chrispus, Tarrant and Juranitch in state court, even if the bankruptcy and alleged discovery abuse never happened. Wortley Depo p. 449, lines 6-9, 23-25; p. 450, line 1-7. Accordingly, there is no causal relationship whatsoever between the fees Wortley incurred in connection with his state court lawsuit and either the bankruptcy or the alleged discovery abuses. Therefore, Wortley is not entitled to any fees incurred in the state court under the *Goodyear Tire* standard. See *Goodyear Tire*, 2017 WL 1377379.

### 4. *Compensatory Sanctions for the Misconduct in Withholding the June 17-19 Emails Pursuant to a Court's Inherent Authority Should Not Include Fees Incurred by Wortley Subsequent to the Eleventh Circuit's Opinion*

Wortley is also not entitled to any fees incurred subsequent to the Eleventh Circuit's opinion because such opinion was not based on any applicable fee shifting statute. Although Wortley insists he is entitled to be reimbursed for all his fees, including those incurred subsequent to the Eleventh Circuit's opinion, he does not base his assertion on any particular statute, but only the Eleventh Circuit's opinion itself. The Eleventh Circuit's opinion, however, does not provide that Wortley should be awarded fees for subsequent legal proceedings. Moreover, such an interpretation is contrary to binding Supreme Court and Eleventh Circuit case law.

Generally, "[i]n our legal system, no attorneys, regardless of whether they practice in bankruptcy, are entitled to receive fees for fee-defense litigation absent express statutory authorization." *Baker Botts L.L.P.*, 135 S. Ct. at 2168. See also *In re Southern California Sunbelt Developers, Inc.*, 608 F.3d 456, 466 (9th Cir. 2010) (holding that in contrast with sanctions pursuant to fee-shifting statutes, only the direct costs of opposing an offending pleading or motion and not fees on fees may be included under the bankruptcy court's inherent power). Accordingly, pursuant to an award based upon the bankruptcy court's inherent authority, and not any fee-shifting statute, Wortley is not entitled to attorneys' fees or costs associated with fee disputes.

To the extent Wortley attempts to rely on §303(i)'s fee shifting provisions as grounds for his post-mandate fees, his reliance is misplaced. First, nowhere in its opinion does the Eleventh Circuit mention §303, and more importantly, this court already dismissed Wortley's §303 claim. (Adv. D.E. 85). Moreover, even if §303 was relevant, the court could not use its inherent

authority to award fees pursuant to §303 because such an award would contravene the express

terms of the statute.  See generally *Siegel*, 134 S. Ct. at 1194 (explaining courts' inherent powers

may not contravene specific statutory provisions.)

By its express terms, there are two preconditions to obtaining fees and costs under

§303(i).  First, the bankruptcy court must have dismissed the case under §303.  Second, the

debtor must not have waived the right to bring a claim pursuant to §303.  *In re Rosenberg*, 779

F.3d 1254, 1264 (11th Cir. 2015) (§303 has two preconditions which are: (1) if the court

dismisses the petition other than by consent, and (2) if the debtor does not waive the right to

judgment); See also *In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035, 1046 (11th Cir.

2008) (holding that §303 did not "implicate subject matter jurisdiction" and thus the debtor's

failure to timely oppose the involuntary petition constituted a waiver); *In re J.B. Lovell Corp.*,

876 F.2d 96 (11th Cir. 1989) (a debtor's conversion of Chapter 7 involuntary proceeding to

Chapter 11 voluntary proceeding rendered moot appeal from bankruptcy court order granting

involuntary petition filed by debtor's creditors because such constitutes a waiver.).   These

prerequisites have not been satisfied.[25]  Therefore Wortley may not seek damages pursuant to a

court's inherent authority for the improper filing of the involuntary petition, because such an

imposition would directly contravene the statutory scheme under §303(i).  See *Siegel*, 134 S. Ct.

at 1194.

Given the clarity of the statutory language and structure of § 303, it would be improper

to allow any other considerations related to a court's inherent authority to undermine the

American Rule in this case.  As explained in *In re Reid*, 854 F.2d 156162-63 (7th Cir. 1988),

---

[25] Moreover, any attempt to relitigate these issues is also barred by the doctrines of collateral estoppel and *res judicata*. See, e.g. *In re Centre De Tricots, Gaspe, Lee*, 10 B.R. 148 (Bankr. S.D. Fla. 1981) (debtor having failed to appeal from bankruptcy court's order of relief was barred by res judicata from asserting claims which would, in order to succeed, require reversal of that order).

Congress has specifically authorized the award of attorneys' fees in certain circumstances, including §303(i), and has thereby pre-empted the judiciary's equitable power to redistribute attorneys' fees in bankruptcy cases.  The *Reid* court therefore held that the claim for attorneys' fees for the wrongful appointment of an interim trustee is pre-empted by § 303(i).  Congress specifically provided relief for bad faith involuntary filing in section §303(i), and specifically provided that such relief was conditioned upon a dismissal and subject to waiver.  For these reasons, any argument by Wortley that the court may use its inherent authority to award sanctions in contravention of §303 for any alleged bad faith filing is foreclosed.

### 5.    *The Court has Already Awarded and Paid Wortley $203,193.57 in Fees which Defendants Should Receive Credit*

Subsequent to the Eleventh Circuit's opinion, on January 31, 2017, over the Defendants' objection, the Court entered an order granting the Trustee's Motion to Abandon (the "Order Granting Motion to Abandon").  See (D.E. 987).  The Order Granting Motion to Abandon: (1) vacated the order allowing the sale of the Global's assets to Chrispus; (2) abandoned the assets to Global and authorized Wortley to maintain possession and control of the assets on Global's behalf; (3) equitably subordinated Chrispus' $1,070,833.34 claim (Claim 2-1) to Wortley's $203,193.57 claim (Claim No. 1-1, as amended by D.E. 422); and (4) authorized the Trustee to pay in full the allowed portion of Wortley's claim in the amount of $203,193.57.  *Id.*

The practical effect of the Order Granting Motion to Abandon was to enforce the Eleventh Circuit's Mandate on an abbreviated basis, over the Defendants' objections and without affording them due process.  As of January 2017, Chrispus and Wortley were the only two creditors with claims outstanding.[26]  Absent subordination, Chrispus and Wortley would have

---

[26] All other claimants received interim distributions from the Trustee, paying their claims in full. *See* (D.E. 326).

been entitled to recovery on a pro rata basis, with at a minimum, Chrispus receiving 84% of any distribution to remaining creditors and Wortley receiving 16% of same. Accordingly, at a minimum, $170,682.60 of the $203,193.57 already paid to Wortley constitutes a sanction imposed on Chrispus.  As discussed in section E above, any sanction fashioned by the Court must be limited to an award of reasonable attorney's fees incurred solely as a result of the Defendant's alleged failure to produce the June 17-19 Emails.  As such, Defendants respectfully request that any fee award made to Wortley credit the amount of sanctions already awarded to Wortley ($170,682.60 or $182,794.82) into consideration. [27]

Dated: July 6, 2017                                    Respectfully submitted,

                                                        **AKERMAN LLP**
                                                        Las Olas Centre II
                                                        350 East Las Olas Boulevard
                                                        Suite 1600
                                                        Fort Lauderdale, FL  33301
                                                        Telephone:     (954) 463-2700
                                                        Facsimile:      (954) 463-2224
                                                        *Counsel for Defendants*

                                                        By:_____*/s/ Michael I. Goldberg*_____
                                                               Michael I. Goldberg
                                                               Florida Bar No. 886602

---

[27] Chrispus asserts that it also possesses an additional claim in the amount of $750,000, *e.g.* the sale purchase price paid by Chrispus to the Debtor.  Such amount has also been subordinated by virtue of the Court's Order Granting Motion to Abandon. In such a scenario, Chrispus would be entitled to 90% of any distributions with Wortley receiving the remaining 10%.  Using these numbers, $182,794.82 of the funds paid to Wortley constitute sanctions already imposed on Chrispus.

42211712;3

AND

**RICE PUGATCH ROBINSON STORFER & COHEN, PLLC**
*Counsel for Chad P. Pugatch and Rice Pugatch Robinson & Schiller, P.A.*
101 NE 3rd Ave., Suite 1800
Fort Lauderdale, FL 33301
Telephone:    (954) 462-8000
Facsimile:    (954) 462-4300

By:    /s/ Chad P. Pugatch
        CHAD P. PUGATCH
        Florida Bar No.: 220582
        cpugatch@rprslaw.com
        CRAIG A. PUGATCH
        Florida Bar No.: 653381
        capugatch@rprslaw.com
        GEORGE L. ZINKLER, III
        Florida Bar No.: 586986
        gzinkler@rprslaw.com

        And

**Law Offices of Nolan Klein, P.A.**
*Counsel for James C. Juranitch*
One East Broward Blvd.
Wells Fargo Tower – Suite 1500
Ft. Lauderdale, FL 33301
Ph:    (954) 745-0588
Fax:    (877) 253-1691

By: /s/ Nolan Klein
        NOLAN KLEIN
        Florida Bar No. 647977
        klein@nklegal.com

42211712;3

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via either CM/ECF, U.S. Mail, and/or e-mail to all parties listed on the service list below (as indicated) on July 6, 2017.

/s/ *Michael I. Goldberg*

<u>**SERVICE LIST**</u>

**15-01447-RBR Notice will be electronically mailed to:**

Michael I Goldberg, Esq on behalf of Defendants, Chrispus Venture Capital, LLC, and Richard Tarrant
michael.goldberg@akerman.com, charlene.cerda@akerman.com

Catherine Douglas Kretzschmar on behalf of Defendants, Chrispus Venture Capital, LLC, and Richard Tarrant
catherine.kretzschmar@akerman.com, jeanette.martinez@akerman.com

Erin Maddocks on behalf of Defendants, Chrispus Venture Capital, LLC, and Richard Tarrant
erin.maddocks@akerman.com

Nolan K. Klein on behalf of Defendant James C Juranitch
klein@nklegal.com, amy@nklegal.com;robin@nklegal.com

Chad P Pugatch, Esq. on behalf of Defendants. Chad P. Pugatch, and Rice Pugatch Robinson Schiller, PA
cpugatch.ecf@rprslaw.com

Craig Pugatch, Esq., on behalf on behalf of Defendants, Chad P. Pugatch, and Rice Pugatch Robinson Schiller, PA
capugatch@rprslaw.com

George L. Zinkle, on behalf of Defendants, Chad P. Pugatch, and Rice Pugatch Robinson Schiller, PA
gzinkler.ecf@rprslaw.com

**15-01447-RBR Notice will not be electronically mailed to:**

Plaintiff Joseph G. Wortley (via email and U.S. Mail)
jgwortley@aol.com
20 SE 3rd Street
Boca Raton, Florida 33432

50

42211712;3