**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:

GLOBAL ENERGIES, LLC,                          Case No.: 10-28935-RBR
f/k/a 714 Technologies, LLC

       Debtor.                                          Chapter 7
                                                             (Involuntary)

JOSEPH G. WORTLEY,

  Plaintiff,

v.                                                           Adversary Number: 15-01447-RBR

RICHARD TARRANT, JAMES JURANITCH,
CHRISPUS VENTURE CAPITAL, LLC, CHAD P.
PUGATCH, RICE PUGATCH ROBINSON &
SCHILLER, P.A., AND PLASMA POWER, LLC,

      Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S "TRIAL MEMORANDUM"; MOTION FOR CONTINUANCE; AND MOTION TO STRIKE

      The Plaintiff submits this response to the Defendants' "Trial Memorandum," and includes herein a Motion to Strike the Defendants "Trial Memorandum," and a Motion for Continuance of the Trial.

### Preliminary Statement

      The Defendants' Trial Memorandum is riddled with mischaracterizations that stretch all credibility, contains some outright lies, and is a transparent desperate attempt to rewrite the history of the last seven years. It is an improper attempt to override the principles Mandate Rule, the Law of the Case Doctrine, Res Judicata, and Collateral Estoppel.

      The Defendants' Trial Memorandum is also misnamed. **It is actually an untimely filing of counterclaims and affirmative defenses**. It is an improper attempt to make a Daubert

Motion. It is an improper ambush four days before trial. **As such, the Defendants Trial Memorandum should be stricken from the record.** If the Court intends to entertain the defendants' attempts to retry their liability for the remedies afforded to Wortley by the Eleventh Circuit Court of Appeals, a continuance of the trial should be granted such that Wortley can properly respond to the host of new allegations and affirmative defenses raised for the very first time in the Defendants' Trial Memorandum. It would be clear error for the Court to entertain them at all, and would be an egregious abuse of the Court's authority to not at least afford Wortley time to show the falsity of the allegations and defenses being raised now for the first time.

The Eleventh Circuit Mandate remanded these proceedings for this Court to "hold an appropriate hearing" on Wortley's damages. The notion that "most of the defendants were not parties to underlying bankruptcy or the appeal" is completely false. Chripsus was the creditor who filed the bad faith bankruptcy, Juranitch was the President, CEO, and Majority Shareholder of the Debtor and conspired with Tarrant the Majority Shareholder and managing member of Chrispus and also conspired with Chrispus' attorney, Pugatch. Pugatch was the attorney for Chrispus during the bankruptcy and at all levels of the appeal. Pugatch even had a successful motion to intervene on behalf of himself to make himself a party to this case.

So while Chripus was the named Appellee in the appeal that resulted in the Mandate, neither Tarrant, Jurantich, nor Pugatch, are separately immune from sanctions. See, e.g., In re Rainbow Magazine, Inc., 77 F.3d 278, 285 (9th Cir. 1996) (affirming sanctions by the bankruptcy court against a nonparty, holding that "Caldwell, through his control of the debtor corporation abused the bankruptcy process in bad faith, justifying the sanction imposed under the inherent powers of the bankruptcy court acknowledged by Congress in Rule 105."); see also Pelc

v. Nowak, No. 8:11-CV-79-T-17TGW, 2014 WL 4446444, at *1 (M.D. Fla. Sept. 9, 2014) ("The Court has the inherent power to sanction parties, lawyers, or both for engaging in conduct that abuses the judicial process; the Court may sanction nonparties for bad faith conduct. Chambers v. NASCO, Inc., 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The inherent power of the Court can be invoked even if procedural rules exist which sanction the same conduct. The Court's inherent powers include the power to control and discipline attorneys appearing before the Court, and to suspend attorneys who practice before the Court.").

The purpose of this trial is not to retell the story of the last seven years. It is only on my damages arising from the defendants' conduct of the last seven years. That conduct has already been established. This Court has acknowledged that this conduct has been established as bad faith when it equitably subordinated Chrispus' claim to my claim and vacated the sale order. It would therefore not only be contradictory to the Appellate Court's Order to retry the diatribe that the defendants have thrown into their "Trial Memorandum"; it would be contradictory to this Court's past orders to do so. **The Court should strike the Defendants' "Trial Memorandum" because it goes far beyond the scope of the trial.**

### *The Assertion that McCarty's Expert Testimony is not Credible and Should be Excluded Under "Daubert" is Completely Frivolous* (Pages 30-32 of Defendants' Trial Memorandum)

While I am addressing this matter more fully by separate filing, it should be summarized here. The defendants' assertion that McCarty's expert testimony is not credible and should be excluded under "Daubert" is completely frivolous, and a mere cursory review of McCarty's deposition transcript will show that it would be clear error for this Court to exclude his testimony. The defendants elected to wait until July 6, 2017 to take McCarty's deposition despite being on notice of his report since at least May 26, 2017 (D.E. 309). I am making all efforts to expedite the printing of McCarty's transcript and will provide that to the Court as soon as is

possible. I have paid approximately $1,400 to have it expedited overnight, and ask the Court to charge that to the defendants as part of my fees, costs, and damages

The standards for rejecting a qualified expert such as Mr McCarty are high and based on his deposition Mr. Goldberg is obviously very concerned that his knowledge, experience and judgment will present a significant problem for his side of the case at trial. That anxiety is not a basis for entertaining a Daubert challenge and the facts presented in the CV of Mr. McCarty, his extensive testimony record, his report and his deposition all directly confirm his qualification to act as an expert in this case. To decide otherwise would be a rejection of both precedents and the facts.

Mr. McCarty has been admitted as an expert for valuation, private equity and investment banking issues in more than a dozen courts including bankruptcy courts in Delaware, Texas, Massachusetts, Connecticut and others involving billions in dollars in damages and claims. In all of those cases he has never been determined by any court to be unqualified to testify as an expert in the face of at least four Daubert challenges.

He has specific knowledge of Global Energies from Jan 2009 thru May 2010 and had previous direct experience with more than three comparable development stage energy companies. His opinions are formed by significantly more than the referenced merger with SES as detailed in his deposition several times and in paragraphs 15 and 30 in his filed report. He used the SES potential merger as a relevant actual live proxy as a contemporaneous transaction involving the company but his judgment was based on many other factors including his 40 plus years of relevant transaction experience.

**If the Court is even considering entertaining a Daubert challenge as to McCarty, the trial should be continued until the Court has had the opportunity to review Mr. McCarty's**

**deposition transcript.** Further, the manner in which the defendants have slipped a motion to exclude McCarty's testimony into their "Trial Memorandum" is inappropriate.

### *The Notion that the Defendants' Should Receive Credit Because the Trustee was Ordered to Pay Out Wortley's Allowed Claim After the Sale was Vacated is Absurd* (Page 47 of Defendants' "Trial Memorandum")

After the sale order was vacated, the trustee was ordered to pay Wortley's allowed claim. This has nothing to do with compensating Wortley for his fees, costs, and damages. It was merely a return of Wortley's money that had been held by the trustee for seven years as a result of the defendants' misconduct. If anything, the defendants' should be responsible for paying the portion of Wortley's claim that was not allowed, and interest on all of Wortley's claims as a creditor in this case.

### *The Assertion that Wortley Misrepresented Facts to the Eleventh Circuit is Ridiculous* (Pages 16 of Defendants' "Trial Memorandum")

The assertion that Wortley misrepresented facts to the Eleventh Circuit is so ridiculous it is hardly worthy of even addressing. **This assertion makes wild assumptions that should probably be taken by the Appellate Court as an insult to their competence**. And it should be taken as an insult to this Bankruptcy Court's intelligence. It assumes that the Eleventh Circuit was not aware of and did not review the primary exhibits (the smoking gun emails) to form their own opinion. The notion that using a ". . ." in an appellate brief to indicate an omission of quoted language from a multi-page email chain (which was part of the exhibits clearly reviewed by the Appellate Court) is some kind of fraud perpetrated on the Eleventh Circuit is really a rather childish argument, and defendants' counsel ought to be quite ashamed of themselves for raising it. And this Court should be insulted that the defendants thought this argument would be entertained.

The time for the defendants' to contest the facts as stated in Wortley's Appellate Brief was in their Brief of Appellee—authored by Pugatch as representative of Chrispus and Tarrant in his capacity as majority owner and managing member of Chrispus. They either did not contest them in that Brief, and they thereby became stipulated, or they did contest them but the Eleventh Circuit did not find them to be credible. Indeed, the Eleventh Circuit issued a "Public Communication" (Appearing at D.E. 347 and elsewhere in this adversary proceeding) to Pugatch instructing him to appear at Oral Argument as his final chance to contest such facts. He did so, and the Circuit Court Judges saw right through his smoke and mirrors. (Transcript of Oral Argument attached as Exhibit A). The defendants could have contested those facts to the Supreme Court of the United States, they did not. They cannot be contested here.

The Appellee Answer Brief was the opportunity for Mr. Pugatch and Chrispus (and Tarrant) to dispute the assertions made in Appellant's Initial Brief. **For example the assertion that the cited e-mail chain of June 17-19, 2010, established a secret strategy among Messrs. Tarrant, Juranitch, Roberts, and Pugatch to file a collusive involuntary bankruptcy petition either with "improper use" or "improper purpose" in mind. These assertions, among others, could have been disputed in the Chrispus' brief, but they were not.** See Wright, Miller et al., Federal Practice & § 3974.2 (West on-line ed. 2014) ("[I]f appellee's brief omits or severely truncates the statement of facts, the court of appeals may decide the appeal based solely on the version of facts provided by the appellant . . . and that may be fatal to the appellee's case.").

Once all the briefs were filed, the Appellate Court's June 16, 2014 letter clearly informed the parties that the Appellate Court was seriously concerned about the conduct of Chrispus' counsel. This Court required Mr. Pugatch and Mr. Zinkler to be personally present to respond to

the Court's inquiries. Mr. Pugatch was put on notice that his own conduct was going to be explored by the Panel at oral argument. The issues of concern included (1) counsel's non-production of the June 17-19, 2010 e- mail chain despite counsel's participation therein; (2) counsel's failure to correct the inaccurate deposition testimony of Mr. Tarrant and Mr. Juranitch; and (3) counsel's arguments to the bankruptcy court that Chrispus' motives in submitting an involuntary bankruptcy petition were honorable.

The time for counsel to dispute the Appellant's underlying assertions was in Chrispus' Answer Brief on the merits. The time for Pugatch to address the issues of concern set forth in the June 16, 2014 letter was prior to oral argument, not in this Court three years later. The defendants' time has passed.

Further, Pugatch had yet another day in court when he filed a Motion to Intervene (granted) with the Eleventh Circuit and a Petition for Rehearing (considered and denied). In a colorful bit of irony, **Pugatch lied to the Eleventh Circuit in his Petition for Rehearing,** (and repeatedly to this Court) when he told the Appellate Court that he produced the smoking gun emails in June 2011. That has been shown to be false. (See D.E. 355). And the Eleventh Circuit either found it to be not credible or just immaterial to the decision.

However, being exposed on this lie did not stop Pugatch from rehashing it with a slightly softer tone in his "Trial Memorandum." Pugatch now argues that because Wortley's counsel was "notified" that production was available this washes Pugatch's hands of the matter; this completely ignores the fact that every time Wortley's counsel tried to act on that "notification" they were rebuffed from receiving the documents. (See D.E. 355). Indeed, it required a Motion to Compel before the documents were finally turned over.

Unfortunately, this sort conduct has become all too common amongst the defendants where they argue one set of facts to the Court when it fits their needs of the day, but then completely reversing course on those facts when it fits the needs of another day (or after they've been proven wrong). And this is the sort of conduct that has been one of the factors that have caused my legal fees to exponentially grow over the last seven years. The defendants make recklessly false assertions to obtain orders that are adverse to me, which sends me and my lawyers scrambling to obtain and argue proof to undo the harm done by their reckless litigation conduct. See D.E. 306, for example; detailing the manner in which Pugatch got a protective order from this Court (which may have prevented earlier discovery of the smoking gun emails) by telling this Court my requests were identical to previous requests; but then Pugatch went and told the District Court and the Appellate Court that the smoking gun emails were not produced because my previous discovery requests were different and therefore produced different results.

Or another example of this sort of conduct is when Mr. Goldberg made the recklessly false assertion that I was not entitled to a fee award because I "stiffed" my lawyers. (Aug. 14. 2015 Hearing Tr. at 10, 11, 17). This sent me and my lawyers scrambling to show just how false this was, and how Goldberg had no reasonable basis whatsoever for making such an assertion. (Which of course, came at some significant expense in fees and time and other resources). In order to address this I was forced to come back to the Court with a sworn declaration on the fees paid. (D.E. 926 to 10-28935-RBR, Ex B). In that sworn declaration, I notified the Court that the defendants are making no secret about their intent to engage in purposely vexatious litigation in an attempt to financially exhaust my ability to pursue them:

Without interim reimbursement of a significant portion of the legal expenses I have already incurred, my ability to continue prosecuting my claims against the Defendants will be severely impaired. This concern is further exacerbated by Mr. Tarrant's threat made to me on or about February 1, 2015 that he has enough

money to outspend me in these proceedings to ensure that he that he does not pay any damages under the Eleventh Circuit's mandate. From everything that I have seen since, that threat seems to be effectively carried out. I have every confidence that my litigation opponents in these proceedings are exceptionally well funded and will continue to try to prevail by relying on the sheer magnitude of their litigation delays and my inability to endlessly keep up with their spending. (D.E. 926 to 10-28935-RBR, Ex B at Paragraph 8).

### *The Defendants' "Trial Memorandum" Improperly Attempts to Relitigate the Facts*

### *Surrounding their Bad Faith Filing and their Liability Arising Therefrom*

The Eleventh Circuit Mandate stated: "It would be clear error to interpret the emails as showing anything other than that Tarrant and Juranitch conspired to have Chrispus file bankruptcy petition in bad faith." This is a conspiracy to commit bankruptcy fraud that dates back to at least early May 2010 when Tarrant reneged on his signed commitment to fund Global with an additional $1 million, which would have made it flush with cash, and when Juranitch contrived a falling out with Wortley as an excuse to steal to the company.

Further, in addition to Tarrant's commitment to loan an additional $1 million, the company was also not insolvent because Wortley was more than willing to fund its operations, as evidenced—among other evidence—by Wortley's putting $30,000 plus of his own funds into the company for the purposes of tendering the interest payment to Chrispus for the note it was falsely claiming to be in default. "Lack of funds" was not an issue for Global. Rather, Tarrant and Juranitch manipulated the number creditors Global had to accomplish their scheme.

The "Trial Memorandum" also makes much to do about my refusal to cave to demands that I give up equity in the Debtor in exchange for Tarrant and Juranitch no longer perpetrating their wrongful conspiracy. Not only is this an improper attempt to rewrite the law of the case, it is a ridiculous assertion on its face and has no place being brought forward at trial.

*McCarty's Expert Report and Deposition Testimony Show that Global, a Development Stage*

*Company, not Having any Revenue is not the Proper Value Determination*

A significant part of Wortley's damages lie within the destruction of the value of his membership interest in the Debtor. McCarty's testimony shows that a $20,000,000 valuation on the Debtor is actually a quite conservative estimate, and this Court should award 32% of that number as damages.

At the Pretrial Conference of June 20, 2017, Mr. Goldberg proclaimed that he could take McCarty's deposition two days before the trial, despite Wortley's offers to have McCarty available much sooner than that. (See transcript of June 20 at pages 17-19). McCarty's deposition was set by Goldberg and taken on July 6. His deposition testimony will be critical to assessing damages and "ensuring that the defendants do not profit from their misconduct and abuse of the bankruptcy process." I am making all efforts to have the deposition transcript available by the morning of July 11 to present to the Court.

WHEREFORE, Wortley requests that this Court Strike the Defendants Trial Memorandum and Grant a Continuance.

Dated: July 10, 2017

Respectfully submitted,

Joseph G. Wortley, *Pro Se*
20 S.E. 3rd Street
Boca Raton, Florida 33432
jgwortley@aol.com

By: _____
JOSEPH G. WORTLEY

## CERTIFICATE OF SERVICE

I certify that on July _10_, 2017, a copy of this document was filed with the Clerk of the Court. I also certify that the foregoing document is being served on this day on all counsel of record or pro se parties identified in the attached Service List via email or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

By: _____
       Joseph G. Wortley

## SERVICE LIST

| Michael I. Goldberg and Catherine E Douglas | michael.goldberg@akerman.com; charlene.cerda@akerman.com |
|---|---|
| Nolan K. Klein | klein@nklegal.com; nina@nklegal.com; amy@nklegal.com; katie@nklegal.com |
| Barry E. Mukamal | bemtrustee@kapilamukamal.com; FL64@ecfcbis.com |
| Office of the US Trustee | USTPRegion21.MM.ECF@usdoj.gov |
| Chad P. Pugatch and George L. Zinkler | cpugatch@rprslaw.com; capugatch@rprslaw.com; gzinkler@rprslaw.com |

# EXHIBIT A

1

1        UNITED STATES COURT OF APPEALS

2            FOR THE ELEVENTH CIRCUIT

3            Appeal Number:  13-11666-V

District Court Docket No.: 0:12-cv-61483-KMW

5     Secondary Case Number: 10-28935-BKC-RBR

6     JOSEPH WORTLEY,

7            Appellant,
             V

8
CHRISPUS VENTURE CAPITAL, LLC,

9
             Appellee.

10                                          /

11

12       Proceedings before the Honorable:

13            Peter T. Fay, presiding

14         Paul C. Huck, by designation

15     William Terrell Hodges, by designation

16

17

18  Wednesday, July 30, 2014

19  Elbert Parr Tuttle Court of Appeals Bldg.

20  56 Forsyth Street, N.W.

21  Atlanta, Georgia 30303

22

23  Transcribed via audio file by:
    Lisa Mudrick, RPR, FPR
24  Notary Public, State of Florida

25

Page 2

```
 1  APPEARANCES:
 2  On behalf of the Appellant:
 3      BRUCE S. ROGOW, P.A.
 4      500 E. Broward Boulevard, Suite 1930
 5      Fort Lauderdale, Florida 33394
 6      BY:  BRUCE S. ROGOW, ESQUIRE
 7      -- and --
 8      PANKAUSKI LAW FIRM PLLC
 9      120 South Olive Avenue, Suite 701
10      West Palm Beach, Florida 33401
11      BY:  ROBERT J. HAUSER, ESQUIRE
12
13  On behalf of the Appellee:
14      RICE PUGATCH ROBINSON & SCHILLER, P.A.
15      101 N.E. Third Avenue, Suite 1800
16      Fort Lauderdale, Florida 33301
17      BY:  CHAD P. PUGATCH, ESQUIRE
18          GEORGE LEO ZINKLER, III, ESQUIRE
19
20
21
22
23
24
25
```

Page 3

1 PROCEEDINGS
2    - - -
3    **JUDGE FAY:** The first case we have this
4 morning is Global Energies Wortley versus
5 Chrispus Ventures Capital. I think we start
6 with Mr. Rogow.
7    **MR. ROGOW:** May it please the Court, Bruce
8 Rogow and Rob Hauser for Joseph Wortley.
9 The June 17 to June 19 e-mail string was
10 newly discovered evidence, newly discovered
11 evidence that should have been revealed when
12 the request to produce documents was filed and
13 served. And so that newly discovered evidence
14 would have made a difference in this case. And
15 therefore, it meets the requirements of rule
16 60(b), newly discovered, could not have been
17 found by due diligence, and could have changed
18 the outcome of the case.
19 The district court, affirming the
20 bankruptcy court's decision not to pursue the
21 hearing based on the newly discovered evidence,
22 the district court's decision was incorrect.
23 There are several mistakes in the district
24 court's decision, mistakes that require
25 reversal of that decision by this Court.

Page 4

1 First, the district court thought that
2 there were other e-mails that were similar to
3 the June 17 to 19 e-mails. But none of the
4 other e-mails were similar to that. The
5 June 17 to June 19 e-mails made clear there was
6 a strategy, and the strategy was to take
7 Wortley out of the business by using
8 involuntary bankruptcy.
9 So to say that these other e-mails were
10 similar and therefore Wortley knew that there
11 was collusion is belied by the actual language
12 of those e-mails.
13 But even more importantly, those e-mails
14 put the lie to the testimony of Juranitch and
15 Tarrant. That testimony, which occurred in
16 October 2010, in that testimony, the deposition
17 testimony, those people testified that there
18 was no collusion, that they didn't collude to
19 use the involuntary bankruptcy. And when they
20 testified, of course, the documents were not
21 available. They could not have been
22 cross-examined on that.
23 So when Wortley filed his motion to
24 dismiss the bankruptcy petition as being in bad
25 faith, he did not have the evidence. What he

Page 5

1 had was testimony from those two parties and a
2 third party, Roberts, which was perjurious. It
3 was completely false.
4 So when the district court judge said that
5 the material was not -- the material was
6 previously available, she was wrong. When the
7 district court judge said that their testimony
8 was not false, she was incorrect about that.
9 The false testimony, the evidence is there
10 in terms of the June 17 to 19 e-mails.
11 Juranitch denied collusion. Tarrant said he
12 did not believe he had spoken to Juranitch.
13 All it of belied by the e-mails, e-mails which
14 were not discovered until March 2012.
15 One of the other things that the district
16 court erred in was saying that she thought that
17 the discovery requests in the state case,
18 because there is a state case, that those
19 discovery requests perhaps were different from
20 the discovery requests that were filed and
21 served in the bankruptcy case. And that's
22 simply not so. That's surmisal that they were
23 different has no basis in fact.
24 If you look at the discovery requests,
25 basically like any discovery requests, they

Page 6

1 wanted all of the discussions, all of the
2 evidence, all of the communications between
3 these parties. And the communications that
4 were not given were the key communications of
5 June 17 to 19 e-mails.
6    JUDGE HODGES: Mr. Rogow, precisely what
7 relief are you seeking? Or stated another way,
8 what relief is available in the bankruptcy
9 court, assuming your position is sustained here
10 on appeal?
11   MR. ROGOW: The relief would be costs,
12 attorney's fees for Mr. Wortley, damages
13 including punitive damages. 11 U.S. Code
14 Section 303(i) provides for damages for a bad
15 faith filing, and so those damages would be the
16 damages would be available.
17   JUDGE HODGES: But what are those damages?
18 What would be the measure of those damages.
19   MR. ROGOW: Well, first of all, the
20 attorney's fees which are substantial. Because
21 had there been a motion to dismiss that was
22 heard based upon knowledge of the actual
23 record, this case would not have proceeded. So
24 you have all those attorney's fees.
25 The damages, the measure of damages would

Page 7

1 be -- this was a million dollars that Chrispus
2 basically saved and benefited by this
3 fraudulent filing. And so the damages in this
4 situation could be punitive damages. And
5 Chrispus, because they conspired to do this bad
6 faith filing, Chrispus could then be liable for
7 punitive damages. And the determination of how
8 much in punitives damages would have to be left
9 to the --
10   JUDGE FAY: The million dollars, is that
11 the million dollars that Chrispus was supposed
12 to put in?
13   MR. ROGOW: Yes. Yes. And so but to
14 answer your question, Judge Hodges, costs,
15 attorney's fees, damages, all of them are
16 available for a bad faith filing.
17 So if this case or when this case, if
18 indeed the Court agrees, is remanded, the
19 instructions should be to determine the remedy.
20 And the remedy, Judge Hodges, would be those
21 kind of things that we are talking about.
22 I think what's important about this case
23 is protecting the integrity of the bankruptcy
24 court. Judge Paskay's opinion In Re: Alford
25 Winn talks at some length about how important

Page 8

1 it is for a bankruptcy court to look at the
2 filing and make a determination as to whether
3 or not the filing was in good faith.
4 This kind of filing is not in good faith.
5 It's an improper use and improper purpose. If
6 there was a dispute between Wortley and
7 Juranitch, and they were both the managers of
8 the company, then you go to state court and you
9 file -- you have a dissolution case in state
10 court, maybe a receiver appointed to try to
11 resolve it. You do not use the bankruptcy
12 process in order to achieve a result that could
13 be achieved if there's a need for it in a state
14 court proceeding. It's a complete misuse of
15 the bankruptcy jurisdiction.
16 And that's what Judge Paskay focused on in
17 In Re: Winn, and made it very clear that you
18 have to be very careful, and a judge has an
19 obligation, a bankruptcy judge has an
20 obligation to determine whether or not there's
21 a good faith filing.
22 Here, that obligation was completely
23 obviated and undermined by the failure to
24 disclose and by the perjurious testimony.
25 So for those reasons we ask that the

Page 9

1 decision below be reversed and the court be --
2 and the case be remanded to the bankruptcy
3 court and the district court. And it does
4 raise an issue too that I have some concern
5 about as to whom this case should go, if indeed
6 the case is remanded.
7 Judge, Judge Ray was very perfunctory in
8 his view of this. His view was nothing can be
9 done. There's been a sale of the assets and
10 it's all over. And he gave very short shrift
11 to the arguments about bad faith. And I think
12 there's some concern when it goes back as to
13 whether or not this is a case it should go to a
14 different judge to look at this afresh and make
15 a determination based upon the full disclosure
16 of all the facts.
17   JUDGE FAY: Thank you, sir. You certainly
18 reserved your rebuttal time.
19 (Technical difficulties.)
20   JUDGE FAY: Thank you. Go right ahead,
21 counsel.
22   MR. PUGATCH: Good morning. May it please
23 the Court. Chad Pugatch on behalf of Chrispus
24 Ventures, the appellee. My associate, George
25 Zinkler, is here in court with me.

Page 10

1 Your Honors, I want to use my time wisely
2 here to address two set of issues. One is the
3 substantive issues raised by this appeal under
4 rule 60(b), and the other is to address any
5 concerns the Court has as indicated by the
6 letter that we had received and otherwise about
7 exactly what happened here.
8    JUDGE FAY: Mr. Pugatch, let me tell you
9 we have not conferred. But my problem is in
10 reading the record it appears to me that both
11 the bankruptcy court and the district judge
12 just missed rule 60(b). So what I need, I
13 really need your help. What was wrong with the
14 scenario that Mr. Rogow just laid out?
15    MR. PUGATCH: Yes, sir. I am more than
16 happy and prepared to address that.
17 This case started with a dispute between
18 two people that were not my client. But my
19 client was the party that put a million dollars
20 into this. As opposed to what was said, there
21 was no obligation to put the second million in.
22 It was considered. But when my client came
23 back from his vacation in Europe and found that
24 Mr. Juranitch and Mr. Wortley were at war with
25 each other, his million dollars was at risk.

Page 11

1 This is all in the record.
2 Global was shut down. The assets had been
3 taken out. The employees were not being paid.
4 The business was dead. And he was out a
5 million dollars.
6 So there had to be a determination of what
7 remedies were available. And one of those
8 remedies from the outset was to put Global into
9 a bankruptcy.
10 Now, if my client was in a position where
11 my client was looking to just --
12    JUDGE HUCK: For what purpose? What would
13 have been the purpose to put Global into
14 bankruptcy?
15    MR. PUGATCH: To try to salvage something
16 out of the assets, Judge. And that's the whole
17 point.
18    JUDGE HUCK: To reorganize?
19    MR. PUGATCH: The initial attempt was to
20 reorganize. We filed this as an involuntary
21 Chapter 11 bankruptcy, not Chapter 7. The
22 standards are the same. And the standards are
23 different both under the bankruptcy and under
24 the bad faith standards as to what you have to
25 do. You have to simply prove the requisite

Page 12

1 number of creditors and that the debtor --
2    JUDGE HUCK: Okay. I understand that.
3    MR. PUGATCH: Yeah.
4    JUDGE HUCK: But the goal was to
5 reorganize. At least that was --
6    MR. PUGATCH: The initial goal was to
7 reorganize the company.
8    JUDGE HUCK: And where is that discussed
9 in the e-mails?
10    MR. PUGATCH: There are e-mails that say
11 that. And it was also in the sworn testimony
12 of the bankruptcy trustee, which was put into
13 evidence, his sworn declarations, which are
14 part of the record on appeal. We filed
15 the 11 --
16    JUDGE HUCK: The bankruptcy trustee would
17 not know the goal of those people who
18 controlled the company.
19    MR. PUGATCH: There was also e-mail
20 chains, and these were put into evidence, that
21 also discussed the fact that the initial goal
22 was to reorganize. It was the only reason for
23 filing under Chapter 11 --
24    JUDGE FAY: Well, it's refuted by the
25 e-mail.

Page 13

1    MR. PUGATCH: -- as opposed to Chapter 7.
2    JUDGE FAY: That's refuted by the e-mail
3 that Juranitch sent to Tarrant.
4    MR. PUGATCH: That's --
5    JUDGE FAY: He lays out the whole plan how
6 to wipe out Wortley.
7    MR. PUGATCH: That's Juranitch's e-mail,
8 Judge. There are other e-mails. And more
9 importantly, this was all addressed up front in
10 the first trial. Judge Ray did not give the
11 short shrift. It was addressed in the first
12 trial.
13    JUDGE FAY: He didn't have the e-mails in
14 the first trial.
15    MR. PUGATCH: Judges, he had other e-mails
16 that said essentially the same thing. And he
17 also had --
18    JUDGE FAY: Tell me where there's one
19 e-mail that says what the June 17, 2010 e-mail
20 says.
21    MR. PUGATCH: It doesn't say exactly the
22 same thing, Judge, but it discusses the fact --
23    JUDGE FAY: Even close. Tell me one that
24 says it even close.
25    MR. PUGATCH: It discusses forming another

Page 14

1 company and having a separate game plan.
2     **JUDGE FAY:** And wiping out Wortley.
3     **MR. PUGATCH:** There were e-mails from my
4 client to Mr. Wortley where he talked about
5 trying to go forward and reorganize. There's
6 one e-mail --
7     **JUDGE FAY:** They had no intention of
8 reorganizing. They wanted to get rid of
9 Wortley's $200,000 note and his stock.
10     **MR. PUGATCH:** Not correct, Your Honor.
11     **JUDGE FAY:** That's what he said in the
12 e-mail.
13     **MR. PUGATCH:** That's what Juranitch said.
14     **JUDGE FAY:** Yes.
15     **MR. PUGATCH:** That's not what my client
16 said. Mr. Juranitch is not my client.
17 Mr. Juranitch is one of the two parties that
18 was at war with each other. And my client was
19 sitting in the middle and had to choose one way
20 to go or the other, chose with the guy with the
21 technology and the goods, so to speak, as
22 opposed to the other guy when they couldn't
23 settle. They made attempts to settle. They
24 couldn't settle.
25 This was discussed up front in the first

Page 15

1 trial. And I proffered. And remember, Judges,
2 this case was not tried based upon evidence
3 being put on through live testimony. By
4 agreement the parties depositions were put
5 into evidence and there was a proffer on each
6 side's part of what was going to happen going
7 forward and what had happened in the past.
8     **JUDGE HUCK:** So your position is these two
9 days of e-mails, these two strings of e-mails,
10 were merely cumulative and basically the same
11 thing as the earlier e-mails?
12     **MR. PUGATCH:** It was cumulative of what
13 Judge Ray had heard from my mouth standing up
14 there saying, Judge, we admit all this. We
15 have no desire to dispute the facts on this.
16 We admit that we had a goal here.
17     **JUDGE HUCK:** So the answer is, yes, they
18 were merely cumulative and didn't add anything
19 more?
20     **MR. PUGATCH:** That's correct.
21     **JUDGE HUCK:** That begs the question why
22 weren't they produced?
23     **MR. PUGATCH:** Now we get into the second
24 issue, Judge. This was a bankruptcy matter
25 which came up on very short notice. This is

Page 16

1 not your typical situation where parties take
2 time, they have time to search, produce
3 documents, make objections, have objections
4 heard. Which is what happened in the state
5 court. And when that process played out, that
6 e-mail was clearly produced. It wasn't hidden.
7 It was produced. It was turned over. There
8 was no secret about that e-mail.
9 What happened in this case --
10     **JUDGE HUCK:** So it's just a coincidence
11 that these particular days of e-mails were
12 omitted inadvertently?
13     **MR. PUGATCH:** It absolutely is, Judge.
14 And we produced over 1,600 pages voluntarily.
15 The way discovery came up in this case --
16 and this is in the record. It's in the
17 transcripts of the depositions. And it was put
18 in both the first and second trials.
19 We were in depositions about two and a
20 half weeks before the actual trial date of
21 November 10th. And sitting in my office with
22 Mr. Softness, who was Mr. Wortley's counsel at
23 the time, there was no discovery requests
24 outstanding. I said, David, don't you want to
25 have discovery? Shouldn't we exchange

Page 17

1 documents? He said, oh, yeah, that's a good
2 idea. Said, okay, we'll each make a request.
3 I will make the request to you. You make one
4 back. We'll give you our documents.
5     **JUDGE HUCK:** Did you review the
6 production?
7     **MR. PUGATCH:** Reviewed the production the
8 best we could.
9     **JUDGE HUCK:** No, no. Did you personally
10 review, pardon me, co-counsel review the
11 production?
12     **MR. PUGATCH:** My associate did the primary
13 review, and then went over with me any
14 questions that he had before we produced
15 documents.
16     **JUDGE HUCK:** These documents, the e-mails
17 we are talking about, were copied to you,
18 correct?
19     **MR. PUGATCH:** It appears they were.
20     **JUDGE HUCK:** So you would not --
21     **MR. PUGATCH:** Not the initial e-mails.
22 But it appears that after that, a couple of
23 days later, they were sent to my office.
24     **JUDGE HUCK:** So you were aware of the
25 existence of those e-mails?

Page 18

1   MR. PUGATCH: I was not personally aware
2 of the existence of those e-mails at that time.
3   JUDGE HUCK: Then when the depositions
4 were taken?
5   MR. PUGATCH: The depositions had already
6 been taken, Judge. The depositions were taken
7 in October.
8   JUDGE HUCK: That wasn't my question.
9   MR. PUGATCH: I am sorry.
10   JUDGE HUCK: When those depositions were
11 taken there was a discussion about whether
12 there had been some pre-discussion about filing
13 the bankruptcy?
14   MR. PUGATCH: Yes, sir.
15   JUDGE HUCK: And it seems to me
16 inconsistent with -- what was said in
17 deposition seemed to be inconsistent with those
18 e-mails. Did that not seem unusual to you or
19 something you should bring to opposing counsel?
20   MR. PUGATCH: When my client testified I
21 did not find an inconsistency in his testimony.
22 And I have his testimony right here. And I
23 think that the testimony as it's been presented
24 to you and paraphrased is not what the
25 testimony says in the actual deposition

Page 19

1 transcript.
2 My client, when questioned about whether
3 he was involved in the process early on and had
4 discussions, said clearly, and it's on page 50
5 of that deposition, yeah, early on I did. He
6 was then asked when that was, and he said,
7 mistakenly first, June '09. And then I said,
8 '09. Then on page 51, oh, '10, June '10.
9 So he testified and admitted that he was
10 involved in discussions on June 10th.
11   JUDGE FAY: What do you do with page 52 of
12 the deposition? I want to know what was the
13 intended purpose of filing the involuntary, but
14 I do not know. Now, he had gotten an e-mail
15 and conferred with you about the purpose.
16   MR. PUGATCH: The reason that he didn't
17 know, Judge --
18   JUDGE FAY: Well, was it to get paid? I
19 do not know. I was not involved with the
20 decision.
21   MR. PUGATCH: He was not.
22   JUDGE FAY: He was right in the middle of
23 it. He set out the plan.
24   MR. PUGATCH: He did not set out the plan.
25 Mr. Juranitch gave his opinion of what a plan

Page 20

1 was. And that plan is not what the plan was as
2 we performed it and played it out in court
3 because --
4   JUDGE FAY: Did you have any conversation
5 with Mr. Juranitch about filing an involuntary?
6 No.
7   MR. PUGATCH: And he didn't.
8   JUDGE FAY: That's an outright lie.
9   MR. PUGATCH: He did not have a
10 conversation with him. It was an e-mail at the
11 time --
12   JUDGE FAY: An e-mail is not a
13 conversation?
14   MR. PUGATCH: An e-mail is not a
15 conversation in the sense that he understood it
16 to be a verbal conversation. And I am quite, a
17 hundred percent sure that he didn't remember
18 that e-mail chain at the time because he had
19 disinvolved himself from the process. There
20 are other e-mails that are put into evidence at
21 the trial where clearly he testifies, and says,
22 and it's in his deposition as well, that
23 because of his friendship with Joe Wortley when
24 the business issues became what they were, they
25 had just gone to the U.S. Open together, and he

Page 21

1 said, I am stepping away from this. I am
2 giving complete control to Ron Roberts. I am
3 taking no part in the decision-making. And he
4 didn't. The dealings from that time forward
5 were with Ron Roberts. Ron Roberts is the one
6 that authorized the filing. And as he
7 testifies in his deposition, Mr. Tarrant did
8 not even know it had been filed until after the
9 fact. And the first person to hear it from was
10 Joe Wortley. Mr. Juranitch --
11   JUDGE HODGES: Slow down just a minute,
12 Mr. Pugatch. This e-mail of June 17 was
13 addressed ostensibly to Mr. Tarrant, that was
14 your client. Did you receive a copy of that at
15 the time it was transmitted?
16   MR. PUGATCH: Not at the time it was
17 initially sent. I apparently received it two
18 days later via a transmittal, a copy from
19 Mr. Juranitch.
20   JUDGE HODGES: And did not Mr. Tarrant
21 respond to that by saying in words more or less
22 that he approved the plan?
23   MR. PUGATCH: He said there were some
24 issues with it, but, you know, it would need to
25 be discussed or something like that, yes, he

Page 22

1 did.
2 There's no question this e-mail exists.
3 The question is does this e-mail change
4 anything that Judge Ray ruled upon after he
5 heard the first trial?
6     **JUDGE FAY:** It changes everything. The
7 purpose was to wipe out Wortley.
8     **MR. PUGATCH:** The purpose was not to wipe
9 out Wortley.
10    **JUDGE FAY:** There's what it says in the
11 e-mail.
12    **MR. PUGATCH:** That was Juranitch's e-mail.
13 That was not Mr. Tarrant. And what Juranitch
14 said in that e-mail about the debtor in
15 possession and all the other stuff that he
16 threw out there is not what we did.
17    **JUDGE HUCK:** Let's turn to Juranitch's
18 deposition. You were there, right?
19    **MR. PUGATCH:** I was there at Mr. Tarrant's
20 deposition. Mr. Zinkler was there at
21 Mr. Juranitch's deposition.
22    **JUDGE FAY:** But you read his deposition,
23 Mr. Juranitch's deposition, correct?
24    **MR. PUGATCH:** Do I have it?
25    **JUDGE FAY:** You read it?

Page 23

1     **MR. PUGATCH:** Yes, absolutely.
2     **JUDGE FAY:** Before you went to the
3 hearing?
4     **MR. PUGATCH:** Yes.
5     **JUDGE HUCK:** His testimony was inaccurate,
6 wasn't it, with regard to the discussions
7 before the filing?
8     **MR. PUGATCH:** He testifies initially that
9 he didn't know or recall whether there were
10 discussions. Then later on he says in his
11 deposition that there were discussions with
12 Mr. Roberts. Now, obviously there's an issue
13 here, potential issue as to whether they
14 considered that e-mail he sent to Roberts,
15 Tarrant and then later copied me was a
16 conversation. The word that was used in the
17 deposition, I believe, was conversation. I
18 don't think it's unreasonable from the point of
19 view of somebody who is a layperson to not
20 consider an e-mail a conversation. Is it a
21 communication? Yes, it is a communication.
22 But at the end of the day, we stood up
23 there from the very first time this went to
24 court and we said to Judge Ray --
25    **JUDGE HUCK:** Did it ever occur to you that

Page 24

1 -- giving you credit for could have been a
2 misunderstanding as to what he meant by
3 communication -- that the basis for the claim
4 was that there was some collusion and that this
5 was set forth, could have at least been
6 represented to have been set forth in those
7 e-mails, and then after the fact maybe we
8 misunderstood the word conversation and we are
9 going to give you these e-mails now? Did that
10 ever occur to you?
11    **MR. PUGATCH:** Judge, I didn't know
12 personally that the e-mail existed or see it
13 until we were doing our due diligence in
14 producing the documents in the state court
15 case. And that's when I saw that e-mail, and
16 it was produced.
17    **JUDGE HODGES:** Wait a minute. You told me
18 a few minutes ago you saw it two days after it
19 was transmitted.
20    **MR. PUGATCH:** Obviously I saw it. If I
21 got it I physically saw it when it came in. I
22 did not have any personal recall of it. And
23 therefore, when Mr. Tarrant testified, and when
24 I read Mr. Juranitch's deposition it didn't
25 occur to me that they had said anything that

Page 25

1 was inaccurate.
2 Remember, these depositions were taken
3 before all this discovery. This discovery,
4 which only occurred because I suggested it, was
5 basically a document dump two days and one day
6 before the trial. Mr. Softness had the option
7 of postponing the trial. He first raised that
8 and then chose not to and said, I want to go
9 forward.
10    **JUDGE HUCK:** Well, he wasn't aware of the
11 existence of those documents. If he had
12 said --
13    **MR. PUGATCH:** He was not.
14    **JUDGE HUCK:** If you had said there are
15 these other e-mail strings, you might want to
16 consider those before we go forward, his
17 decision may have been different.
18    **MR. PUGATCH:** We have had two trials.
19 Judge Ray --
20    **JUDGE HUCK:** No, I understand that. But
21 might not his decision have been different if
22 he said, I have got some additional e-mails
23 that you might be interested in?
24    **MR. PUGATCH:** Well, I am sure if he had
25 that e-mail he would have put it in at that

Page 26

1 time like he put in other hundreds of other
2 documents and e-mails.
3    **JUDGE HUCK:** Okay. So your explanation is
4 you gave him 1,600 plus documents, many
5 e-mails, and just by coincidence the two that
6 are now the subject of this discussion were
7 omitted?
8    **MR. PUGATCH:** I -- sorry.
9    **JUDGE HUCK:** There were e-mails before and
10 after these two days of e-mails.
11    **MR. PUGATCH:** I produced on very short
12 notice to the --
13    **JUDGE HUCK:** Is that correct? Is that
14 your --
15    **MR. PUGATCH:** Yes, I produced --
16    **JUDGE HUCK:** No. Is that your position,
17 that it's merely a coincidence that these two
18 days of e-mails, among all the 1,600 documents
19 that were filed, including e-mails before and
20 after those two days of e-mails, that's --
21    **MR. PUGATCH:** I don't take the position,
22 Judge, that these were the only ones that were
23 not produced at that time. I am sure there
24 were other ones that were not produced at that
25 time. We are focused on these e-mails because

Page 27

1 these are the ones that they have put into the
2 motion that form the basis of the rule 60(b)
3 motion. I have no doubt that there were other
4 e-mails that were missed and not put into the
5 production at that time. We did the best we
6 could producing 1,600 pages of documents what
7 amounted to one day before the trial. We got
8 theirs two days before. And per agreement they
9 got ours the next day.
10    **JUDGE HODGES:** Mr. Pugatch, who were the
11 decision-makers with respect to the filing of
12 the involuntary petition in the bankruptcy
13 court?
14    **MR. PUGATCH:** The decision-makers were Ron
15 Roberts and myself. Mr. Tarrant had nothing to
16 do with that decision. Mr. Juranitch had
17 nothing to do with that decision. This is what
18 I do for a living. I have done it for 37
19 years. And I stand by the fact that everything
20 we did in filing that petition was in good
21 faith, within our rights. And this is what I
22 told Judge Ray, stood up there. We put the
23 evidence on by proffer. And my proffer makes
24 it very clear in the first trial, the second
25 trial, and by the testimony that ultimately

Page 28

1 came in in conjunction with the second trial,
2 where I basically said, so what, we knew
3 Mr. Wortley was alleging his conspiracy.
4    **JUDGE HUCK:** Let me ask a question about
5 that because it seems to me before Judge Ray
6 -- before Judge Williams you were conflating
7 the same issue versus the same or different
8 evidence, and that went round and round and
9 round.
10    **MR. PUGATCH:** Yes.
11    **JUDGE HUCK:** And the judges seem to have
12 bought into that. But those are two different
13 issues, whether it's the same issue brought up
14 in the prior hearing or whether it's the same
15 evidence to support the claims in those issues.
16    **MR. PUGATCH:** The reason it is significant
17 is because in order to grant relief under 60(b)
18 it has to not only be newly discovered
19 evidence, it has to, as Mr. Rogow acknowledged
20 the standard is, that it would have changed the
21 outcome.
22 And you have Judge Ray, who lived with
23 this case for three years through the first
24 trial, the second trial, a motion for summary
25 judgment where they alleged newly discovered

Page 29

1 evidence and then admitted it wasn't newly
2 discovered, and that half of what they said was
3 newly discovered they put into evidence in the
4 first trial, a motion to withdraw the reference
5 to Judge Cohn, the follow-up motions that came
6 back before the bankruptcy court, including the
7 motion for rehearing where these June 17th and
8 19th e-mails were presented to Judge Ray.
9 And he looked at it all. And he didn't
10 say it to slough it off or anything else. He
11 basically said, after I have seen this now for
12 two or three years, so what? It's all the same
13 thing that Mr. Wortley has been alleging since
14 day one. He filed his state court action which
15 alleges all these things, and I took that all
16 into consideration. And I find that in all
17 that's there he's got state court remedies. He
18 is suing in state court for his damages, but
19 it's not bad faith in the bankruptcy because
20 they had a right to file it. They moved for a
21 trustee. And Mr. Mukamal is an independent
22 bankruptcy trustee took this over, and he made
23 the decision to sell the assets after Mr. --
24 this is all in the record -- after Mr. Wortley
25 asked for the ability to come up with

Page 30

1 financing, came up with nothing, and
2 Mr. Mukamal -- doesn't matter what those
3 e-mails said. Mr. Mukamal has testified, I am
4 the one that made the decision to sell the
5 assets because the company was dead. It had no
6 money. It wasn't going anywhere.
7     JUDGE HUCK: You answered my question.
8 Thank you.
9     MR. PUGATCH: My time is up. I am happy
10 to stay here and clarify any point that the
11 Court has on any of these issues. There's a
12 lot here.
13     JUDGE FAY: At the hearing on May 24,
14 2012, on page 12 you said you were probably
15 going to this up with the Florida Bar. Did you
16 do that?
17     MR. PUGATCH: I did not. It was a
18 statement made in anger in response to
19 something that was said to me or an accusation
20 that was made against me.
21     JUDGE FAY: Only speaking for myself, I
22 think maybe it would be a good idea to let them
23 look at it.
24     MR. PUGATCH: I am not uncomfortable with
25 having the Bar look at any of this. And would

Page 31

1 obviously have the opportunity to explain all
2 this in more detail, Judge. I am totally
3 comfortable with what I did. I take pride in
4 what I do. And in no way, shape, or form would
5 I disrespect the Court by intentionally not
6 producing a document or authorizing testimony
7 that I felt or thought would be perjurious.
8 And my reputation in 37 years stands for that.
9     JUDGE FAY: You didn't correct, didn't
10 correct the testimony of Mr. Tarrant.
11     MR. PUGATCH: First of all, I didn't put
12 that testimony in. It was put in by
13 Mr. Softness.
14     JUDGE FAY: No, I am talking about the
15 deposition where you represented him.
16     MR. PUGATCH: No. In the deposition
17 Mr. Zinkler was there. I don't think
18 Mr. Zinkler had any knowledge of any of this.
19     JUDGE FAY: Sir, you are listed as
20 representing Mr. Tarrant at his deposition.
21     MR. PUGATCH: Correct.
22     JUDGE FAY: I am asking if you corrected
23 his erroneous testimony?
24     MR. PUGATCH: Judge, I don't think his
25 testimony was erroneous other than --

Page 32

1     JUDGE FAY: You and I have a different
2 concept of the English language.
3     MR. PUGATCH: He may not have recalled
4 that one e-mail that he did not have access to
5 that had not been produced --
6     JUDGE FAY: He set out the whole plan and
7 said he was going to confer with you about it.
8 That's what he says in the e-mail.
9     MR. PUGATCH: That's Juranitch.
10     JUDGE FAY: To Tarrant.
11     MR. PUGATCH: That's Juranitch. Juranitch
12 is not my client.
13     JUDGE FAY: I see.
14     MR. PUGATCH: Mr. Tarrant is my client.
15 Mr. Roberts is my client. And I listened to
16 them. I don't listen to Mr. Juranitch. And I
17 make my recommendations and provide the advice
18 and consultation that I am requested to by my
19 clients.
20 If somebody else has an opinion of
21 something, they can have whatever opinion they
22 want. They can think there's going to be a
23 debtor in possession and a whole bunch of other
24 things he said in that e-mail that, frankly, I
25 thought were ridiculous. And when I gave my

Page 33

1 client the advice, it was file the involuntary
2 petition, file it as an 11, immediately move
3 for a trustee.
4 Mr. Wortley did not contest the petition.
5 There's no 303 damages here. He didn't contest
6 the petition. He didn't contest the status of
7 the creditors. He didn't contest that the
8 company wasn't paying its debts as they came
9 due.
10 We could have filed it as a 7. And a
11 trustee would have come in, and the first thing
12 the trustee would have done would be to
13 liquidate the assets. Instead, we gave it an
14 opportunity to reorganize until the trustee
15 said, unless somebody comes up with more money,
16 I can't do anything. I am going to sell the
17 assets.
18 And Judge Ray makes note on more than one
19 occasion that he was comfortable with this
20 because however it started it was put in the
21 hands of an independent bankruptcy trustee that
22 Mr. Wortley agreed to. And therefore it wasn't
23 me. It wasn't Tarrant. It wasn't Juranitch.
24 It wasn't Wortley. It was Barry Mukamal,
25 Trustee, deciding, I can't do anything with

Page 34

1 these assets; I have got to sell them. And
2 that's what happened. And my client made an
3 offer that subordinated his own million dollars
4 and paid all the creditor debt, including
5 Mr. Wortley's debt, in full. And Mr. Wortley
6 had the opportunity to come in and was offered
7 the same deal. If you want the company then do
8 the same thing we did, subordinate your debt,
9 pay the legitimate creditor debt, and you can
10 have the company. He didn't want to do that.
11 So Judge Ray was comfortable that
12 everyone's rights had been protected here, that
13 there was no bad faith. And he heard it at
14 least three if not four or five different
15 times. And was fed up with it at the end of it
16 to the point where he sanctioned Mr. Wortley
17 for all of this.
18 So I get it. I understand the Court's
19 concern here. Looking at this in isolation
20 it's something that you could be offended by.
21 But it's not the way it happened. It's not
22 anything that was done either intentionally or
23 to hide something from the Court.
24 I could read you the portion of the
25 transcript where I summarized everything on the

Page 35

1 motion for rehearing, and basically starts by
2 saying, so what, we admitted all this. What's
3 the difference whether this e-mail --
4     JUDGE FAY: You never admit that Juranitch
5 and Tarrant conspired to get rid of Wortley?
6     MR. PUGATCH: No, sir.
7     JUDGE FAY: No, you never did?
8     MR. PUGATCH: Because that part I don't
9 think is true.
10    JUDGE FAY: The e-mail shows me that's
11 exactly what they were doing.
12    MR. PUGATCH: I respectfully disagree with
13 the Court. I don't think that that e-mail says
14 that they were conspiring to get rid of
15 Mr. Wortley. That e-mail indicates that that
16 was one conclusion that could play out. But
17 whatever Mr. Juranitch --
18    JUDGE HUCK: I guess we won't know because
19 those documents weren't produced. You keep
20 going back, and I think this mantra was
21 repeated many times, that Mr. Wortley agreed to
22 the trustee. Mr. Wortley could have bought in,
23 bought the assets. But the issue goes back
24 earlier than that, and that is whether the
25 bankruptcy itself was filed in good faith. And

Page 36

1 if that was not the case, we never would have
2 had a trustee. And if there had been a
3 trustee, the trustee would have been finished.
4 There would not have been a sale.
5     MR. PUGATCH: The only good faith that's
6 required, Your Honor, in order to file an
7 involuntary bankruptcy is that you have the
8 requisite legitimate creditor debt. Nobody has
9 disputed my client was owed a million dollars
10 and that the company was generally not paying
11 its debts as they came due.
12    JUDGE HUCK: That's the bankruptcy
13 standard.
14    MR. PUGATCH: Yes.
15    JUDGE HUCK: I am taking about the
16 purpose, the intention of filing the
17 bankruptcy. Anyway.
18    MR. PUGATCH: My client clearly was trying
19 to get his million dollars back. If that
20 occurred by virtue of a sale of the assets, and
21 he had as much right to buy as anyone else,
22 that's just not bad faith. And I understand
23 the Court's --
24    JUDGE FAY: June 18, 2010 e-mail, Tarrant
25 to Juranitch, outlines the plan for you to

Page 37

1 review. Part of the plan is getting rid of
2 Wortley's 200,000 note and his stock. Need to
3 discuss with Chad.
4     MR. PUGATCH: That didn't happen.
5     JUDGE FAY: That was the purpose. That
6 was the purpose your client outlined in an
7 e-mail.
8     MR. PUGATCH: That was a response to one
9 of, I think, seven points that were in that
10 e-mail.
11    JUDGE FAY: Which, of course, he denied at
12 his deposition that he'd had anything to do
13 with it.
14    MR. PUGATCH: No, sir, he didn't. He said
15 he was involved early on, and then at a point
16 in time in June -- he said he was involved in
17 June of 2010. These e-mails are June of 2010.
18 And then he said toward the end he withdrew
19 himself from the process because of his
20 friendship with Wortley.
21    JUDGE FAY: Thank you very much, sir.
22    MR. PUGATCH: Thank you, Judges.
23    JUDGE FAY: Mr. Rogow, you tell us how
24 much time you need for rebuttal.
25    MR. ROGOW: Not long, Your Honor, just a

Page 38

1  minute or two.
2    **JUDGE FAY:** All right.
3    **MR. ROGOW:** The question is would this
4  information have made a difference? And I
5  think that patently the June 17 to June 19
6  trail of e-mails was right on the point of
7  whether or not this was a bad faith filing.
8  The e-mails speak for themselves. The
9  testimony of Juranitch and Tarrant speaks for
10 itself. There's no way you can put those two
11 together and find that Tarrant and Juranitch
12 were speaking the truth.
13   **JUDGE HUCK:** Mr. Rogow, let me ask you a
14 question. I think the theory of the appellees
15 is similar to what Al Maguire would say, no
16 harm, no foul, that your client agreed to the
17 trustee. And that was repeated time and time
18 again before and by Judge Ray, I think even
19 Judge Williams. And that your client had the
20 opportunity to buy the assets if he so chose.
21 Do you have a comment about that?
22   **MR. ROGOW:** It begs the question, the
23 question that you posed, Judge Huck, about
24 whether or not there should have even been a
25 bankruptcy proceeding. And I think that's the

Page 39

1  key to this case. When he made the motion to
2  dismiss the filing for being a bad faith
3  filing, that is the critical moment of this
4  case. And had that been heard based upon a
5  fully developed record and disclosed e-mails
6  and e-mails that belied the testimony that was
7  produced at that November 10 hearing, we never
8  would have had any of the subsequent
9  proceedings. There would have been no
10 Mr. Mukamal, no trustee, nothing. None of that
11 would have happened.
12 So that's my answer to the question, that
13 this goes back to the very moment of that
14 filing and whether or not that filing was in
15 good faith. And this newly discovered evidence
16 shows that it was not.
17 Thank you.
18   **JUDGE FAY:** Thank you very much. Thank
19 you.
20
21 (Proceedings concluded.)
22
23
24
25

Page 40

1         **C E R T I F I C A T E**
2              - - -
3
4  **State of Florida**
5  **nty of Palm Beach**
6
7     I, Lisa Mudrick, RPR, FPR, certify that I
8  stenographically report the foregoing
9  ceedings, pages 1 through 39, and that the
10 script is a true record via audio file.
11
12      Dated August 26, 2014.
13
14
15
16
17
18
19
20    LISA MUDRICK, RPR, FPR
      Mudrick Court Reporting, Inc.
21    1615 Forum Place, Suite 500
      West Palm Beach, Florida 33401
22    561-615-8181
23
24
25